**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ARROW ELECTRONICS, INC.,

        Plaintiff,

   v.

ELNA CO., LTD.,
ELNA AMERICA INC.,
MATSUO ELECTRIC CO., LTD.,
TOSHIN KOGYO., LTD.,
OKAYA ELECTRIC INDUSTRIES CO., LTD.,
OKAYA ELECTRIC AMERICA INC.,
TAITSU CORPORATION,
TAITSU AMERICA, INC.,
SHINYEI KAISHA,
SHINYEI TECHNOLOGY CO., LTD.,
SHINYEI CAPACITOR CO., LTD.,
SHINYEI CORPORATION OF AMERICA, INC.,
NITSUKO ELECTRONICS CORPORATION,
NISSEI ELECTRIC CO., LTD., SHIZUKI ELECTRIC CO., INC.,
SOSHIN ELECTRIC CO., LTD.,
SOSHIN ELECTRONICS OF AMERICA, INC.,
NIPPON CHEMI-CON CORPORATION, and
UNITED CHEMI-CON, INC.,

        Defendants.

---

**CIVIL COMPLAINT**

---

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE .............................................................................5

III.  PARTIES ................................................................................................................6

      A.    Plaintiff .......................................................................................................... 6

      B.    Defendants ...................................................................................................... 8

            i.     ELNA ................................................................................................... 8

            ii.    Matsuo.................................................................................................. 9

            iii.   TOSHIN KOGYO .............................................................................. 9

            iv.    Okaya ................................................................................................. 10

            v.     Taitsu.................................................................................................. 10

            vi.    Shinyei ............................................................................................... 11

            vii.   Nitsuko .............................................................................................. 12

            viii.  Nissei.................................................................................................. 13

            ix.    Shizuki ............................................................................................... 13

            x.     Soshin................................................................................................. 13

            xi.    Nippon Chemi-Con ........................................................................... 14

      C.    Agents And Co-Conspirators ....................................................................... 14

IV.   TRADE AND COMMERCE .................................................................................16

V.    FACTUAL ALLEGATIONS .................................................................................17

      A.    Background ................................................................................................... 17

            i.     Capacitors are an essential commodity for virtually all electronic
                   devices................................................................................................ 17

            ii.    Electrolytic Capacitors: Aluminum and Tantalum ................................... 19

iii. Electrostatic Capacitors: Film ................................................................... 19

VI. CHARACTERISTICS AND TRENDS of the Market for Affected Capacitors FACILITATED AND MOTIVATED THE CONSPIRACY. .......................................... 20

    A. Capacitors are bought and sold as commodities. .................................. 20

    B. The Market is Concentrated in a Limited Number of Manufacturers Who Can Control The Market. .............................................................................. 21

    C. High Barriers to Entry Make It Difficult for New Manufacturers to Enter the Market. ................................................................................................ 22

    D. Demand for Affected Capacitors Weakened During the Conspiracy Period. ...... 23

    E. Demand for Affected Capacitors is Relatively Inelastic over the Short Term. .... 26

    F. There Is a Large Number of Purchasers of Affected Capacitors, Each With Limited Purchasing Power Individually. .............................................. 27

    G. Tight Relationships Between Competing Manufacturers Facilitate Exchange of Information among Conspirators. ................................................... 28

VII. THE CONSPIRACY ........................................................................................29

    A. Price-Fixing, Supply Constraint, and Bid-Rigging ............................... 29

    B. Conspiratorial Meetings ...................................................................... 32

    C. Defendants' U.S.-Based Subsidiaries Marketed, Sold, and Delivered Their Parents' Price-Fixed Capacitors in Furtherance of the Conspiracy's Purpose ..... 55

    D. UCC Advanced the Conspiracy's Aims and Purposes in the United States for Nippon Chemi-Con .............................................................................. 57

    E. Soshin America Advanced the Conspiracy's Aims and Purposes in the United States for Soshin Co. ............................................................................. 60

    F. Shinyei America Advanced the Conspiracy's Aims and Purposes in the United States for Shinyei Kaisha ........................................................................ 61

    G. Okaya America Advanced the Conspiracy's Aims and Purposes in the United States for Okaya Co. ............................................................................. 63

    H. Taitsu America Advanced the Conspiracy's Aims and Purposes in the United States for Taitsu Corp. .......................................................................... 65

    I. ELNA America Advanced the Conspiracy's Aims and Purposes in the United States for ELNA ................................................................................... 67

VIII.   ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY .............................................68

IX.   U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO
      ANTICOMPETITIVE PRACTICES IN THE CAPACITORS INDUSTRY................... 69

X.   FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND THE
     CONTINUING TORT DOCTRINE................................................................. 76

XI.   PLAINTIFF'S INJURIES ................................................................80

XII.   CLAIM FOR RELIEF ....................................................................80

      Restraint of Trade in Violation of the Sherman Act § 1, 15 U.S.C. § 1 (Alleged
      Against All Defendants) .......................................................................... 80

XIII.   DEMAND FOR JUDGMENT .........................................................82

      JURY TRIAL DEMANDED ........................................................... 83

## AMENDED COMPLAINT

Plaintiff Arrow Electronics, Inc. ("Arrow") brings this action for damages under the antitrust laws of the United States against defendants ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO., Ltd.; Okaya Electric Industries Co., Ltd.; Okaya Electric America Inc.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Shinyei Technology Co., Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America, Inc.; Nitsuko Electronics Corporation; Nissei Electric Co., Ltd.; Shizuki Electric Co., Inc.; Soshin Electric Co., Ltd.; Soshin Electronics of America, Inc.; Nippon Chemi-Con Corporation; United Chemi-Con, Inc. (collectively, the "Defendants"), and alleges as follows:

## I.   INTRODUCTION

1.      For decades, Defendants and their co-conspirators maintained an international cartel to control prices and limit competition in the multi-billion dollar market for certain capacitors. The conspiracy among Defendants and others (collectively, the "Conspirators" and the "Conspiracy") was well-documented by the Conspirators themselves, who kept records in dozens of meetings spanning multiple decades. These records were revealed in the course of an investigation by the U.S. Department of Justice, and especially after co-conspirator Panasonic agreed to self-report and cooperate with investigators in exchange for leniency. Plaintiff Arrow was a direct purchaser of capacitors from these conspirators, unknowingly paying inflated prices as a result of the cartel's price-fixing, and accordingly brings this suit under the antitrust laws of the United States.

2.      Capacitors are small, widely used components found in almost every kind of electronic device, meaning that demand is immense. The capacitor manufacturing business is

dominated by several large corporations—mostly the Conspirators here—and there are high barriers to entry for new manufacturers to enter the industry. Capacitors are sold like commodities, since similar capacitor designs are interchangeable among different manufacturers. Accordingly, price is the primary way that different manufacturers can distinguish their products.

3.     The Conspirators here produce specific kinds of capacitors, namely aluminum, tantalum, and film capacitors (together, "Affected Capacitors"). The Conspirators began working together to combat falling margins caused by increased competition from manufacturers of Affected Capacitors, reduced demand for electronics like personal computers that relied most heavily on Affected Capacitors, and the rise in demand for a new type of capacitor (the ceramic capacitor), among other factors.

4.     To combat falling prices, the Conspirators agreed amongst themselves to reduce competition by fixing prices, artificially limiting their manufacturing output, and rigging bids to allocate customers between themselves, among other things. These agreements were reached at regular meetings, held multiple times per year, between the Conspirators, and in other ad hoc group and bilateral meetings and communications between the Conspirators. The conspiracy began no later than 1997, and continued through at least January 2014 (the "Conspiracy Period").

5.     In these meetings and communications, the Conspirators—erstwhile competitors in manufacturing Affected Capacitors—exchanged their most sensitive confidential price information, fixed uniform prices to ensure profitability, set production levels, agreed on which member should win certain customers' bids (to allocate customers among all members), and coordinated marketing and communications strategy for justifying and concealing these anticompetitive pricing and output levels. The Conspirators also used the meetings to discipline

2

members who violated earlier price, output, and marketing agreements, ensuring adherence to the dictates of this organized, anticompetitive conspiracy.

6.      As a result, Conspirators followed these collusive agreements and understandings as they issued bids and price announcements and "negotiated" prices with their customers—selling Affected Capacitors at inflated non-competitive prices throughout the Conspiracy period. Through their collusive, anticompetitive actions, Conspirators effectively negated, and reversed the normal economic benefits of increased competition, and thus cost their customers, including Plaintiff, hundreds of millions of dollars in overcharges.

7.      The Conspirators concealed their anticompetitive conduct from customers, regulators, and the public. On numerous occasions, Coconspirators were warned to delete written documents and emails, to avoid creating paper trails, and to fabricate explanations to justify the cartel-imposed price and production levels. The Conspiracy remained an international secret until the spring of 2014, when law enforcement and competition authorities around the globe first publicly acknowledged their respective investigations into anticompetitive conduct in the capacitors industry.

8.      In 2014, Conspirator Panasonic Corporation, on behalf of itself and certain of its wholly-owned subsidiaries, admitted to the U.S. Department of Justice ("DOJ") that the Conspirators engaged in a conspiracy to fix the prices of Affected Capacitors, and that Conspirators' cartel activities were undertaken for the purpose of artificially maintaining and inflating prices of aluminum, tantalum, and film capacitors sold to United States purchasers and purchasers worldwide.

9. On September 2, 2015, the DOJ filed an Information charging Conspirator NEC TOKIN Corporation with "knowingly" joining and participating in a conspiracy violating Section 1 of the Sherman Act by entering into and engaging in a combination and conspiracy "to suppress and eliminate competition by fixing and rigging bids of certain electrolytic capacitors in the United States and elsewhere" from "at least as early as April 2002 until in or about December 2013." In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." On January 25, 2016, NEC TOKIN Corporation pleaded guilty to conspiracy to fix the prices of electrolytic capacitors as charged in the Information.

10. Since then, numerous other Defendants and co-conspirators have agreed to plead guilty to conspiring with Conspirators to fix prices and limit competition in the market for Affected Capacitors, including Hitachi Chemical Co., Ltd., Rubycon Corporation, ELNA Co., Ltd., Holy Stone Holdings Co., Ltd., Matsuo Electric Co., Ltd., and Nichicon Corporation.

11. On October 18, 2017, the DOJ announced that a federal grand jury had returned an indictment against Nippon Chemi-Con Corporation. The DOJ's Information charged that Nippon Chemi-Con Corporation had "[f]rom at least as early as September 1997 and continuing until in or about January 2004 ... knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices and rigging bids for electrolytic capacitors in the United States and elsewhere."

12. In addition to the corporate defendants, the DOJ has also charged ten of the Conspirators' executives with conspiring to fix prices and rig bids for electrolytic capacitors.

13. During the Conspiracy Period, Plaintiff and its affiliates and subsidiaries purchased Affected Capacitors in the United States directly from certain Conspirators, and, as a result of the

Conspiracy, paid higher prices than would have prevailed in a competitive market. Plaintiff thus has suffered damages as a consequence of the Conspiracy, and brings this action to recover the overcharges it paid for the Affected Capacitors it purchased during the Conspiracy Period.

## II.   <u>JURISDICTION AND VENUE</u>

24.     Plaintiff brings this action to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit, and reasonable attorneys' fees arising from Defendants' price-fixing and bid-rigging in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

25.     This Court has subject matter jurisdiction over this action pursuant to Section 4 of the Clayton Act (15 U.S.C. §§ 15(a)) and 28 U.S.C. §§ 1331 and 1337.

26.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce. The Conspiracy directly and substantially affected the price of Affected Capacitors purchased in the United States. This effect gives rise to Plaintiff's antitrust claims—in particular, because the Conspiracy among Defendants and their co-conspirators directly and substantially affected the price of Affected Capacitors that Plaintiff purchased in Colorado.

27.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act (15 U.S.C. § 22). In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States as they manufactured Affected

Capacitors for sale in the United States, and their conspiratorial conduct had a substantial effect on interstate and foreign trade and commerce.

28.    Venue is proper in the District of Colorado under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claim occurred in this District. A substantial portion of the affected interstate trade and commerce was carried out in this District, including Plaintiff's purchase of Affected Capacitors at artificially inflated prices in Colorado. Additionally, venue is also proper in this district because each defendant is either an alien corporation, sold Affected Capacitors in this district, otherwise transacts business in this District, or is otherwise found in this District. Defendants and their co-conspirators knew or should have known that price-fixed Affected Capacitors would be sold and shipped into this district.

## III.    PARTIES

### A.    Plaintiff

29.    Plaintiff Arrow Electronics, Inc. is a New York corporation with its principal place of business in Centennial, Colorado. Arrow is a leading U.S. seller of electrical components and a provider of products, services and solutions to industrial and commercial users of electronic components and enterprise computing solutions around the world.

30.    Arrow and its affiliates and subsidiaries directly purchased Affected Capacitors in the United States from the Defendants and their co-conspirators. As such, Arrow has suffered antitrust injury as a result of Defendants' and co-conspirators' anticompetitive and unlawful conduct.

31.     During the Conspiracy Period, Arrow purchased Affected Capacitors that were negotiated in the United States and were controlled by a team based in the United States. Arrow's purchase orders for these Affected Capacitors were issued from the United States,  invoices for these Affected Capacitors were sent to the United States, and  payments for these Affected Capacitors were made by Arrow from the United States. Arrow's employees based in the United States were responsible for selecting vendors for these Affected Capacitors, and for deciding which Affected Capacitors to purchase.

32.     NIC Components Corporation ("NIC") is a New York Corporation with its principal place of business in Melville, New York. NIC is an affiliate of Arrow, and a major purchaser and distributor of passive electronic components, including capacitors. NIC directly purchased Affected Capacitors in the United States from the Defendants and their co-conspirators. As such, NIC has suffered antitrust injury as a result of Defendants' and co-conspirators' anticompetitive and unlawful conduct.

33.     During the Conspiracy Period, NIC purchased Affected Capacitors that were negotiated in the United States and were controlled by a team based in the United States. NIC's purchase orders for these Affected Capacitors were issued from the United States, invoices for these Affected Capacitors were sent to the United States, and  payments for these Affected Capacitors were made by NIC from the United States. NIC's employees based in the United States were responsible for selecting vendors for these Affected Capacitors, and for deciding which Affected Capacitors to purchase.

34.    NIC has assigned to Plaintiff Arrow all of its antitrust claims arising out of or related to its purchase of Affected Capacitors during the Conspiracy period. Descriptions of Arrow's claims in this complaint include the claims of NIC that were so assigned.

35.    Richardson RFPD ("Richardson") is a Delaware Corporation with its principal place of business in Geneva, Illinois. Richardson is a wholly owned subsidiary of Arrow. Richardson is a specialized electronic component distributor and solutions engineer. Richardson directly purchased Affected Capacitors in the United States from the Defendants and their co-conspirators. As such, Richardson has suffered antitrust injury as a result of Defendants' and co-conspirators' anticompetitive and unlawful conduct.

36.    During the Conspiracy Period, Richardson purchased Affected Capacitors that were negotiated in the United States and were controlled by a team based in the United States. Richardson's purchase orders for these Affected Capacitors were issued from the United States, invoices for these Affected Capacitors were sent to the United States, and all payments for these Affected Capacitors were made by Richardson from the United States. Richardson's employees based in the United States were responsible for selecting vendors for these Affected Capacitors, and for deciding which Affected Capacitors to purchase.

37.    Richardson has assigned to Plaintiff Arrow all of its antitrust claims arising out of or related to its purchase of Affected Capacitors during the Conspiracy period. Descriptions of Arrow's claims in this complaint include the claims of Richardson that were so assigned.

### B.    **Defendants**

#### i.    **ELNA**

8

38.     Defendant ELNA Co., Ltd. ("ELNA Co."), is a Japanese corporation with its principal place of business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture 222-0033, Japan. During the Conspiracy Period, ELNA Co. manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates, to United States purchasers.

39.     Defendant ELNA America Inc., ("ELNA America") a California corporation, is a wholly-owned subsidiary of ELNA Co. with its principal place of business located at 879 West 190th Street, Suite 100, Gardena, California 90248. During the Conspiracy Period, ELNA America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers aluminum, tantalum, and film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, ELNA Co.

40.     Defendants ELNA Co. and ELNA America are together referred to herein as "ELNA."

### ii.     Matsuo

41.     Defendant Matsuo Electric Co., Ltd. ("Matsuo") is a Japanese corporation with its principal place of business located at 3-5- Sennari-cho, Toyonaka-shi, Osaka 561-8558, Japan. During the Conspiracy Period, Matsuo manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

### iii.     TOSHIN KOGYO

42.     Defendant TOSHIN KOGYO Co., Ltd. ("TOSHIN KOGYO") is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo, Japan. During the Conspiracy Period, TOSHIN KOGYO manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates, to United States purchasers.

### iv.     Okaya

43.     Defendant Okaya Electric Industries Co., Ltd. ("Okaya Co.") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan. During the Conspiracy Period, Okaya Co. manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

44.     Defendant Okaya Electric America Inc. ("Okaya America"), an Indiana corporation, is a wholly-owned subsidiary of Okaya Co. with its principal place of business located at 52 Marks Road, Suite 1, Valparaiso, Indiana 46383. During the Conspiracy Period, Okaya America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Okaya Co.

45.     Defendants Okaya Co. and Okaya America are together referred to herein as "Okaya."

### v.     Taitsu

46.     Defendant Taitsu Corporation ("Taitsu Corp.") is a Japanese corporation with its principal place of business located at 2-23-20, Kizuki, Nakahara-ku, Kawasaki, Kanagawa 211-

0025, Japan. During the Conspiracy Period, Taitsu Corp. manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

47.     Defendant Taitsu America, Inc. ("Taitsu America"), a California corporation, is a wholly-owned subsidiary of Taitsu Corp. with its principal place of business located at 6160 Mission Gorge Road, Suite 100, San Diego, California 92120. During the Conspiracy Period, Taitsu America—either directly or through its business units, subsidiaries, agents, or affiliates— sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taitsu Corp.

48.     Defendants Taitsu Corp. and Taitsu America are together referred to herein as "Taitsu."

### vi.     Shinyei

49.     Defendant Shinyei Kaisha ("Shinyei Kaisha") is a Japanese corporation with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan. During the Conspiracy Period, Shinyei Kaisha manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

50.     Defendant Shinyei Technology Co., Ltd. ("Shinyei Tech") is a Japanese corporation and a corporate affiliate of Shinyei Kaisha with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan. Until February 2011, Shinyei Tech—either directly or through its business units, subsidiaries, agents, or affiliates—manufactured, sold, and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents, or affiliates, or those of Shinyei Kaisha.

11

51.     Defendant Shinyei Capacitor Co., Ltd. ("Shinyei Capacitor") is a Japanese corporation and a corporate "affiliate" of Shinyei Kaisha with its principal place of business located at Shinagawa Crystal Square 11F, 1-6-41 Konan, Minato-ku, Tokyo 108-0075, Japan. Starting in or about February 2011, Shinyei Capacitor was established by Shinyei Kaisha to take over the film capacitors business of Shinyei Tech. After in or about February 2011, Shinyei Capacitor—either directly or through its business units, subsidiaries, agents, or affiliates— manufactured, sold, and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents, or affiliates, or those of Shinyei Kaisha (including, without limitation, Shinyei Tech).

52.     Defendant Shinyei Corporation of America, Inc. ("Shinyei America") is a Delaware corporation and a wholly-owned subsidiary of Shinyei Kaisha with its principal place of business located at 1120 Avenue of the Americas, 4th Floor, New York, New York 10036. During the Conspiracy Period, Shinyei America—either directly or through its own business units, subsidiaries, agents and affiliates or those of Shinyei Kaisha—sold and distributed to United States purchasers film capacitors manufactured either directly by Shinyei Kaisha or through Shinyei's business units, subsidiaries, agents and affiliates (including, without limitation, Shinyei Capacitor and Shinyei Tech).

53.     Defendants Shinyei Kaisha, Shinyei Capacitor, and Shinyei America are together referred to herein as "Shinyei."

### vii.     Nitsuko

54.     Defendant Nitsuko Electronics Corporation ("Nitsuko") is a Japanese corporation with its principal place of business located at 2031-1, Ogawara, Suzaka-shi, Nagano-ken, 382-

0071, Japan. During the Conspiracy Period, Nitsuko manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, and affiliates to United States purchasers.

### viii.    Nissei

55.    Defendant Nissei Electric Co. Ltd. ("Nissei") is a Japanese corporation with its principal place of business located at 201, Motodate, Hanamaki, Iwate, 025-0061, Japan. During the Conspiracy Period, Nissei manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries agents, and affiliates to United States purchasers.

### ix.    Shizuki

56.    Defendant Shizuki Electric Co., Inc. ("Shizuki") is a Japanese corporation with its principal place of business located at 10-45 Taisha-cho, Nishinomiya, Hyogo 662-0867, Japan. During the Conspiracy Period, Shizuki manufactured, sold, and distributed film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

### x.    Soshin

57.    Defendant Soshin Electric Co., Ltd. ("Soshin Co.") is a Japanese corporation with its principal place of business located at 3-13-16, Mita, Minato-ku, Tokyo 108-8322, Japan. During the Conspiracy Period, Soshin manufactured, sold, or distributed film capacitors either directly or through its business units, subsidiaries, agents, and affiliates to United States purchasers.

58.    Defendant Soshin Electronics of America Inc. ("Soshin America"), a California corporation, is a wholly-owned subsidiary of Soshin Co. with its principal place of business located at 2520 Mission College Boulevard #104, Santa Clara, California 95054. During the Conspiracy Period, Soshin America—either directly or through its business units, subsidiaries, agents, or

13

affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Soshin Co.

59.     Defendants Soshin Co. and Soshin America are referred to collectively herein as "Soshin."

### xi.     Nippon Chemi-Con

60.     Defendant Nippon Chemi-Con Corporation ("NCC") is a Japanese corporation with its principal place of business located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan. During the Conspiracy Period, NCC manufactured, sold, and distributed aluminum, tantalum, and film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers.

61.     Defendant United Chemi-Con, Inc. ("UCC"), an Illinois Corporation, is a wholly-owned subsidiary of NCC with its principal place of business located at 9801 West Higgins Road, Rosemont, Illinois 60018. During the Conspiracy Period, UCC— either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent, NCC—manufactured, sold, and distributed aluminum, tantalum, and film capacitors to United States purchasers.

62.     Defendants NCC and UCC are together referred to herein as "Nippon Chemi-Con."

### C.     <u>Agents And Co-Conspirators</u>

63.     The anticompetitive and unlawful acts alleged in this Complaint were authorized, ordered, or executed by the Conspirators' respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Conspirators' businesses or affairs.

64.     Each Conspirator acted as the principal, agent, or joint venturer of or for other Conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint. Each Conspirator that is a subsidiary of a foreign parent acts as the U.S. agent for Affected Capacitors made by its parent company. As alleged more fully below, each Conspirator headquartered outside the United States relied on its agents in the United States to carry out, enforce, and conceal the cartel in the United States.

65.     Various individuals, partnerships, corporations, associations, persons, and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of the Conspiracy. These co-conspirators who are not named as Defendants include, but are not limited to, Panasonic Corporation, which operated during part of the Conspiracy Period under the name Matsushita Electric Industrial Co., Ltd. ("Matsushita", and together with Panasonic Corporation, "Panasonic Corp."), Panasonic Corporation of North America ("PCNA;" Panasonic Corp. and PCNA are together referred to herein as "Panasonic"), SANYO Electric Co., Ltd., SANYO North America Corporation, NEC TOKIN Corporation ("NEC TOKIN Corp."), NEC TOKIN America, Inc. ("NEC TOKIN America"; NEC TOKIN Corp. and NEC TOKIN America are together referred to herein as "NEC TOKIN"), KEMET Corporation ("KEMET Corp."), KEMET Electronics Corporation ("KEC"; KEMET Corp. and KEC are together referred to herein as "KEMET"), Fujitsu Ltd. ("Fujitsu"), AVX Corporation ("AVX"), Holy Stone Enterprise Co., Ltd. ("Holy Stone Enterprise"), Milestone Global Technology, Inc. ("Milestone") which was also known as HolyStone International, Holy Stone Polytech (Holy Stone Enterprise, Holy Stone Polytech and Milestone, doing business as HolyStone International, are together referred to herein as "Holy

Stone"), Nichicon Corporation ("Nichicon Corp."), Fujitsu Media Devices, Ltd. ("FMD"), FPCAP

Electronics (Suzhou) Co., Ltd. ("FPCAP"), Nichicon (America) Corporation ("Nichicon

America") (Nichicon Corp. and Nichicon America are together referred to herein as "Nichicon"),

Hitachi Chemical Co., Ltd. ("Hitachi Chemical"), Hitachi AIC Inc. ("Hitachi AIC"), Hitachi

Chemical Co. America, Ltd. ("Hitachi Chemical America") (Hitachi Chemical, Hitachi AIC, and

Hitachi Chemical America are together referred to herein as "Hitachi"), Rubycon Corporation

("Rubycon Corp."), and Rubycon America Inc. ("Rubycon America") (Rubycon Corp. and

Rubycon America are together referred to herein as "Rubycon").

## IV.   **TRADE AND COMMERCE**

78.     During the Conspiracy Period, each Defendant, directly or through one or more of

its parents, affiliates, subsidiaries, or business units sold or delivered to U.S. purchasers aluminum,

tantalum, or film capacitors in a continuous and uninterrupted flow of interstate commerce,

including through and into this judicial district.

79.     By way of example, the following Defendants assisted their respective corporate

parent Defendants with the sale or delivery to United States purchasers of the parents' respective

aluminum, tantalum, or film capacitors: ELNA America; Okaya America; Taitsu America; Shinyei

America; and Soshin America.

80.     Conspirators engaged in illegal conduct both inside and outside of the United States

that caused direct, substantial, and reasonably foreseeable anticompetitive effects on commerce

throughout the United States.

81.     During the Conspiracy Period, Conspirators collectively controlled a vast majority

of the markets for Affected Capacitors, both globally and in the United States.

82.     The United States is a large and important market for Affected Capacitors. Sales in the United States account for a significant portion of Conspirators' revenues. As such, an important aim of the Conspiracy was to affect prices and competition in the United States markets for Affected Capacitors.

83.     Conspirators knowingly and intentionally sent price-fixed and bid-rigged Affected Capacitors into the stream of commerce of the United States. Such conduct was meant to produce and did in fact produce a substantial harmful effect on U.S. commerce in the form of artificially high prices being paid for Affected Capacitors by U.S. customers, including Plaintiff.

84.     Affected Capacitors manufactured abroad by Conspirators and sold in the United States constitute domestic or import commerce.

85.     To the extent any of Plaintiff's purchases of Affected Capacitors do not constitute domestic or import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce that gives rise to the claims asserted herein.

86.     The unlawful conduct described herein, and its anticompetitive effect on U.S. commerce, proximately caused antitrust injury to Plaintiff in the United States in the form of anticompetitive, artificially inflated prices for Affected Capacitors, which were the natural, foreseeable, and intended consequence of Defendants' anticompetitive conduct.

## V.     FACTUAL ALLEGATIONS

### A.     Background

#### i.     Capacitors are an essential commodity for virtually all electronic devices.

87.     Capacitors are ubiquitous electrical components, essential to the operation of circuits in almost all electronic devices. At the simplest level, capacitors can store an electrical charge, block the flow of current, and release stored charges a circuit. By exploiting these physical properties of capacitors, circuit designers can use capacitors to store energy for rapid discharge (for example, cameras might use capacitors to store energy from the battery and then rapidly release it to fire the flash bulb), to smooth out the flow of electricity in a circuit (capacitors can absorb the highs and discharge to fill in the lows), to filter certain signals or currents (for example, capacitors can block current flowing in only one direction, while allowing "alternating current" to continuously flow through the circuit), and to accomplish many other complex functions necessary for almost all modern electronics.

88.     A few basic properties distinguish all capacitors from one another. The first is its "capacitance," which is roughly a measure of how much charge the capacitor can hold at a given voltage.

89.     The second distinguishing property is the "dielectric." Every capacitor consists of two or more parallel conductive metal plates, each separated from the next by a layer of non-conductive insulating material called a "dielectric." Each plate is attached to a wire referred to as a "lead," which connects it to the rest of the circuit.

90.     Third, there are a number of different categories of capacitors, including electrostatic, electrolytic, and electrochemical. The Conspiracy affected the markets for electrolytic capacitors, specifically aluminum and tantalum capacitors (named for their conductive materials) and electrostatic capacitors, specifically film capacitors (named for their dielectrics, or

18

insulating materials). The Conspiracy was motivated in part by increased competition from another type of capacitor, namely ceramic capacitors (also named for their dielectric insulating materials).

91.     When electric current flows into the capacitor via the leads, one plate acquires a positive charge, and the other, a negative charge. The dielectric prevents these opposite-but-attracting charges from reaching each other, creating an electrical field and building up voltage in the capacitor (almost like a battery). The only way for the positive and negative charges to reach each other is to flow back out through the circuit—when and if the circuit allows them to connect. Circuits can thus be designed to charge capacitors and then allow them to discharge through the circuit as needed.

### ii.     Electrolytic Capacitors: Aluminum and Tantalum

92.     Electrolytic capacitors are polarized, meaning that they have to be positioned in a particular direction within an electrical circuit (with the positive lead facing the positive side of the power source, and the negative lead facing the negative side). Their polarized nature gives them a higher capacitance than their electrostatic counterparts, allowing for more sophisticated applications.

93.     Aluminum and tantalum capacitors, named for the metals of which they are comprised, are two of the most popular forms of electrolytic capacitors. Aluminum and tantalum capacitors were subjects of the Conspiracy.

### iii.     Electrostatic Capacitors: Film

94.     Electrostatic capacitors are not polarized and therefore can be installed in either direction. They have a lower capacitance than their electrolytic counterparts, but allow for stable and sustained usage at a low cost.

95.     Film capacitors, which are a type of electrostatic capacitors, employ a layer of plastic film as their insulating dialectric. Film capacitors were a subject of the Conspiracy.

## VI.     CHARACTERISTICS AND TRENDS OF THE MARKET FOR AFFECTED CAPACITORS FACILITATED AND MOTIVATED THE CONSPIRACY.

95.     A number of characteristics made the capacitors industry particularly prone to successful price-fixing and bid-rigging during the Conspiracy Period, including the commoditization of the market, concentration of manufacturing in a limited number of companies, high barriers to entry for new manufacturers, weakening demand that was nonetheless inelastic over the short term, interrelated business relationships that facilitated communication between competing manufacturers, and a large number of purchases that each individually possessed only limited purchasing power. Conspirators were aware of each of these factors, which motivated or enabled them to achieve their injurious anti-competitive ends throughout the Conspiracy Period.

### A.     Capacitors are bought and sold as commodities.

96.     Capacitors are commoditized products. As discussed above, only a few physical properties distinguish one capacitor from another, and therefore capacitors made by different manufacturers with the same form, capacitance, and dielectric and conductive materials are generally interchangeable with each other. Manufacturers of products incorporating capacitors often utilize several different brands of the same type of capacitor interchangeably within a single device.

97.     As a result, price tends to be the primary way for competing manufacturers to distinguish their capacitors, and price is the main driver behind purchasing decisions.

98.     Capacitors tend to be sold in large volumes, and individual capacitors are small and may cost as little as a fraction of a cent. Even small pricing changes can thus have significant competitive effects.

99.     As Conspirators recognized prior to and throughout the Conspiracy Period, the interchangeability of different brands of capacitors and the centrality of price as a means of distinguishing manufacturers' products rendered the market especially susceptible to anticompetitive manipulation. By curtailing price competition, the Conspirators effectively eliminated competition in the market for capacitors.

100.    Additionally, because almost all Conspirators produced interchangeable, nearly identical capacitors, they were able to easily agree on uniform prices and detect any "cheating," or departures from the set prices by a Conspirator. This heightened the Conspirators' ability to maintain an organized cartel with control over prices and the ability to punish violators of the cartel's set policies and prices.

**B.      The Market is Concentrated in a Limited Number of Manufacturers Who Can Control The Market.**

101.    Together, Conspirators accounted for the majority of Affected Capacitors sales both globally and in the United States throughout the duration of the Conspiracy period. In 2014, Conspirators collectively accounted for over 70% of Affected Capacitors sales.

102.    Given their collective domination of the Affected Capacitors market, Conspirators were able to control the overall pricing and supply of Affected Capacitors throughout the Conspiracy Period. Non-participants did not have strong enough market power to undercut the cartel's concerted pricing and meet all or a significant part of the demand for Affected Capacitors. Moreover, the high concentration of market share made it easier for cartel members to coordinate

pricing and monitor other members' pricing and production, because there were only a limited number of cartel members to coordinate with and monitor.

**C.** **High Barriers to Entry Make It Difficult for New Manufacturers to Enter the Market.**

103.     The market for Affected Capacitors is a mature, commoditized market in which there are high barriers to entry for new manufacturers. These high barriers to entry further helped Conspirators maintain their dominance despite charging supracompetitive prices.

104.     As discussed above, capacitors are small commodities sold at very low prices and correspondingly low margins, so success and profitability in the industry depends on achieving significant economies of scale.

105.     The current industry is dominated by firms like the Conspirators that are well entrenched in the market, with multinational operations, global market reach, and diverse product portfolios of various types of passive electrical components. Conspirators have long-standing, well-established relationships with both sellers of raw materials and purchasers of finished capacitors all around the world. Further, they have access to significant financial resources that allow them to build new manufacturing operations and facilities, or to expand and retrofit existing ones, as the market and technology demand. Conspirators can also use their capital to establish and secure necessary supply chain commitments for all necessary raw materials. Additionally, many Conspirators have developed internal processing capabilities for raw materials or have established relationships with raw materials producers to ensure that their requirements will be met.

106.     A new entrant to the market would need to invest hundreds of millions of dollars to build fabrication plants and acquire the necessary production technology, then hire and retain

skilled and knowledgeable manpower, find and secure suppliers and supply-chain commitments for the raw materials necessary to manufacture competitive products, and then find and market its products to potential purchasers around the world. And to achieve competitive margins, the new entrant would have to develop global supply and purchasing contacts and began marketing a tremendous volume of capacitors.

107.   No notable new manufacturers have entered the aluminum, tantalum, or film capacitors industries in well over a decade, other than through strategic alliances or acquisition of companies or business units already producing specific electrolytic capacitor products (such as Hitachi AIC's sale of its tantalum capacitor production operations to Holy Stone in 2009).

### D.   Demand for Affected Capacitors Weakened During the Conspiracy Period.

108.   During the Conspiracy Period, demand for Affected Capacitors declined. Weakening demand threatened Conspirators' prices and margins, further motivating Conspirators to fix and stabilize prices.

109.   According to a leading capacitors industry analyst, global consumption of aluminum, tantalum, and film capacitors significantly declined between 2003 to 2014. Consumption of tantalum capacitors dropped from approximately 2.4% of global volume for fiscal year 2003 to an estimated 1.1% for 2014. Consumption of aluminum capacitors dropped from approximately 10.2% for fiscal year 2003 to an estimated 6.8% for fiscal year 2014. Consumption of film capacitors dropped from approximately 2.5% for fiscal year 2003 to an estimated 1.1% for fiscal year 2014.

110.   A key factor in the declining demand has been a general decline in demand for home and consumer electronics, particularly personal computers and consumer audio-video

equipment, as smart phones and tablets have taken over the role that many separate (and larger) electronic devices used to perform. For instance, the PC market, which historically has accounted for almost 50% of aluminum and tantalum capacitor manufacturers' revenues, has seen declining sales since the early 2000s.

111.    During the 2008 recession, shrinking automobile sales further diminished demand for Capacitors. MK Meeting notes state, inter alia, "The automotive sales in the United States were less than 1 million units in September. It was the first since February 1993. The conditions are very gloomy[;]" "The sales for in-vehicle applications in main markets are not good and there is no way out in sight[;]" "Car-related business is particularly bad and sales will decrease by about 30%. . . . Conductive product sales will decrease by 40% [from the prior month]."

112.    An October 15, 2008 Competitor Trend Report based on a recent "JFC" (Japanese Film Capacitors) group meeting notes that film capacitor orders received by each competitor "stay low because of economic slump in North America, no positive forecast is being observed for 2009."

113.    Another key factor behind the falling demand for Affected Capacitors is the rise in popularity of the ceramic capacitor, named for the ceramic material that serves as the dielectric. The physical properties of ceramic (especially its malleability) allow manufacturers to tightly stack alternating layers of ceramic and conductive metals into smaller capacitors than possible with other materials, creating what are known as Multilayer Ceramic Capacitors, or MLCCs. These additional layers increase total capacitance, so essentially, a Multilayer Ceramic Capacitor provides higher capacitance in a smaller package.

114.    After Multilayer Ceramic Capacitors were introduced in the late 1990s, they provided formidable competition for Affected Capacitors—especially as prices for ceramic capacitors began to fall. Currently, the price of Multilayer Ceramic Capacitors is, on average, only a fraction of the price of aluminum, tantalum, and film capacitors, with an average per unit price of approximately $.0006. Even the cheapest Affected Capacitors can be 100 times more expensive on a per unit basis. A 2011 industry report circulated by one of the Conspirators states, "Because all customers changed what they could to MLCC due to the impact of price increases, demand [for manganese tantalum capacitors] decreased suddenly. The decrease was 20 to 30% compared to last year. It will just continue to decrease from now on too[.]"

115.    Although ceramic capacitors are not fully interchangeable with Affected Capacitors, the superiority of ceramic capacitors for certain applications led equipment and component manufacturers to invest enormous time and expense to redesign their products to replace Affected Capacitors with ceramic capacitors. For example, March 11, 2009 MK Meeting Notes state that, in contrast to the prior models, Samsung's new LCD TV model would incorporate MLCC capacitors rather than tantalum capacitors "so no more orders are expected."

116.    As a result of the above market trends, producers were left with excess supply and insufficient demand for Affected Capacitors to maintain their investment.  Faced with  increased requests by purchasers for price reductions, Conspirators feared that price competition would reduce, if not eliminate, profitability for Conspirators' Affected Capacitor-manufacturing operations.

117.    Under normal business conditions, when confronted with weak demand conditions, firms will attempt to maintain their sales by taking market share from competitors through

decreasing prices. For this reason, firms faced with static or declining demand have a greater incentive to collude with competitors to avoid price competition and profit erosion.

118.   MK Meeting Notes from 2008 reflect the following common sentiment amongst Conspirators: "In this situation, if we struggle to improve the business, it will cause further decrease in prices, leading to decreased profitability. But if the production decreases, the management demands an increase in the sales in their natural course of action."

119.   A December 19, 2008 email drafted by Rubycon reported that "Nichicon will probably go bankrupt if things continue with such terrible performance," and thus, Nichicon was "very interested in joining" Rubycon in coordinated price increase action.

120.   In order to stabilize prices, Conspirators engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices, limiting supply, and rigging bids for Affected Capacitors sold in the United States and elsewhere.

### E.   Demand for Affected Capacitors is Relatively Inelastic over the Short Term.

121.   Although circuits and devices can be redesigned to reduce demand over many years when superior or cheaper technology comes along, short- and medum-term demand for Affected Capacitors is relatively inelastic. Demand inelasticity for Affected Capacitors further facilitated the Conspiracy, allowing Conspirators to raise prices without significantly undermining sales volumes.

122.   "Demand inelasticity" means that price variations do not significantly impact sales volumes. This phenomenon is experienced when a product has an important function, but has few or no practical substitutes.

123.     As described above, capacitors are an essential component of almost all electronic products. Crucially, electronic devices designed to use one type of capacitor (that is, a capacitor of a certain size, shape, capacitance, and dielectric and conductive materials) will require that type of capacitor to work: although different brands of capacitors can be substituted for another in the device, there is no substitute for using that type of capacitor in the circuit. For example, to take advantage of cheaper ceramic capacitors, device manufacturers had to invest enormous time and money into redesigning their products to use ceramic capacitors rather than Affected Capacitors. Even as these redesigns were underway, demand for Affected Capacitors remained inelastic over the short and medium term because device manufacturers needed Affected Capacitors to continue manufacturing their existing products. Notably, purchasers of Affected Capacitors often faced strict deadlines tied to promised product delivery dates that deprived them of meaningful choice in the face of supracompetitive prices.

124.     Moreover, the low price of most capacitors means that they generally make up only a very small percentage of the production cost of the finished electronic devices in which they are contained. Nearly all Affected Capacitors cost well under $1 per unit, with most costing no more than a few cents, and many costing mere fractions of a cent. Therefore, even a relatively significant increase in the price of Affected Capacitors would have a minimal effect on the purchase price of electronic devices.

**F.     There Is a Large Number of Purchasers of Affected Capacitors, Each With Limited Purchasing Power Individually.**

125.     In the markets for Affected Capacitors, Conspirators sell to a wide number of purchasers around the globe, the vast majority of which during the Conspiracy Period made up no more than 10% of each Conspirator's respective annual net sales, year over year.

126.    Thus, because purchasing power is thinly spread among a large number of purchasers, Conspirators could refuse even their most valuable clients' requests for better terms, providing lockstep prices and production lead times to purchasers who tried to shop around for the best deal.

127.    For example, an internal email from one of the Conspirators dated December 2007 states: "Member companies are increasing their prices. Although I am afraid our good clients will request reduction, we will not need to reduce our prices."

## G. Tight Relationships Between Competing Manufacturers Facilitate Exchange of Information among Conspirators.

128.    The Conspirators had strong relationships with one another, through personal connections and well-established industry trade groups. These connections between Conspirators gave them many opportunities both before and during the Conspiracy Period to discuss and exchange competitive information regarding the pricing and supply of Affected Capacitors.

129.    Various Conspirators have attended bi-annual meetings of the World Capacitors Trade Statistics program since its inception in 1986. This program was formed for the purpose of collecting and disseminating monthly statistics on world shipments of capacitors.

130.    The World Capacitors Trade Statistics program includes Japanese, American, and European trade organizations that provided networking opportunities for Conspirators.

131.    The Japan Electronics and Information Technology Industries Association ("JEITA") includes Defendants Matsuo, Nippon Chemi-Con, Okaya, and Soshin, and co-conspirators Hitachi Chemical, Rubycon, and Nichicon. JEITA was formed in 2000 from two earlier organizations, the Electronic Industries Association of Japan and the Japan Electronic Industries Development Association, and contains a capacitor working group.

132.     In Europe, the European Passive Components Industry Association ("EPCIA"), provides similar networking opportunities and includes Conspirator Nichicon.

133.     Aside from these organizations' formal gatherings, during which Conspirators were able to discuss and exchange sensitive competitive information, Conspirators also have numerous business connections between their former and current colleagues, co-venturers, or partners employed by other Conspirator companies. Key decision-makers for the major producers have both direct and indirect personal access to one another. These relationships were also exploited to further the Conspiracy and exchange sales intelligence.

## VII.   THE CONSPIRACY

### A.     Price-Fixing, Supply Constraint, and Bid-Rigging

134.     Facing the market conditions described above—diminishing demand and a market well suited for anticompetitive price-fixing—Conspirators combined, conspired, and contracted to suppress and eliminate competition for Affected Capacitors sales by fixing prices, constraining supply, and rigging bids. This occurred for the duration of the Conspiracy Period, which ranged from at least 1997 through at least January 2014.

135.     Conspirators charged their customers anticompetitive prices determined by both oral and written agreements, understandings, and exchanges of sensitive competitive information provided by each Conspirator.

136.     For example, Conspirators' electronic communications and cartel meeting notes from throughout the Conspiracy Period include statements like: "[C]apacitors are running short in the market and there is no better timing than now for us to raise prices." "Let's stop this meaningless competition." "That's too cheap! Put your price up!" "Let us proceed while

exchanging information so that we are not taken for a ride by customers." "Our past competition for winning market share resulted in an extremely severe situation of the industry as a whole . . . we wish to cooperate with you so that the industry will be back to life again. We kindly ask for your continued cooperation."

137.    In addition, Conspirators shared some of their most sensitive competitive information with one another to determine how the cartel would operate. Conspirators exchanged information regarding costs of materials and labor (among other fixed and variable input costs), sales volumes, profitability, current and intended future prices, production capacity, customer- and industry-specific pricing demands and proposed responses thereto, market forecasts, and other sensitive information. Conspirators provided one another with this secret business intelligence during formal cartel meetings, ad hoc meetings between subsets of Conspirators, and through miscellaneous written and oral communications.

138.    The cartel was organized and disciplined: Conspirators monitored the prices of their fellow cartel members during the Conspiracy Period and punished "cheaters" who strayed from the agreed pricing. Typically, cheaters were either called out and chastised at meetings in front of other Conspirators, or in more serious cases, punished through temporary exclusion from cartel meetings and other informational exchanges. Nonetheless, all Conspirators that were temporarily excluded were eventually reintegrated into the Conspiracy during the Conspiracy Period.

139.    For example, Nichicon and Nippon Chemi-Con were each temporarily excluded at times from certain cartel discussions regarding price fixing in the aluminum and tantalum capacitors markets. Nichicon and Nippon Chemi-Con were reintegrated in the Conspiracy upon demonstrating their continued commitment to the Conspirators' anti-competitive objectives and

collusive agreements, as evidenced by their attendance at subsequent cartel meetings (as reflected in meeting notices and minutes) and the subsequent circulation of their own competitively sensitive information to other Conspirators and receipt of the same from their counterparts.

140.    Alternatively, "cheaters" were reprimanded during cartel meetings for failing to adhere to the Conspirators' price-fixing agreements. For example, at one cartel meeting, a representative from Nippon Chemi-Con criticized a representative of ELNA in front of the other attendees for taking away business from other Conspirators. These reprimands were intended to and had the effect of ensuring future cooperation from the "cheaters" with the Conspirator's anti-competitive objectives and agreements.

141.    In order to justify and maintain their inflated prices, Conspirators further agreed to reduce production in order to prevent excess supply from further diminishing prices.

142.    Notes from an October 8, 2008 MK Meeting, remarked that Conspirators, including Defendants Matsuo, Nippon Chemi-Con, ELNA, Rubycon, and Hitachi commonly agreed: "if we struggle to improve the business, it will cause further decrease in prices, leading to decreased profitability. But if the production decreases, the management demands an increase in the sales in their natural course of action."

143.    Conspirators coordinated to quote similar or identical production lead times (elapsed time between placement of the order and delivery of the goods) to purchasers in order to manipulate the balance of supply and demand in Conspirators' favor. This coordination permitted Conspirators to mete out the supply of their products, thereby artificially restricting supply and creating the perception of a supply shortage.

144.    To conceal the Conspiracy and justify the artificial lead times and limitations on supply, Conspirators invented excuses or grossly exaggerated the effect of natural disasters and market disruptions. For example, Conspirators contrived excuses like difficulties obtaining raw materials necessary for production (e.g., tantalum ore and powder, aluminum foil, plastic film, dielectric resins), labor shortages, and production and shipping delays caused by natural disasters (e.g., the 2011 Tohoku earthquake and tsunami, typhoons in Asia, and flooding in Thailand and other countries where Conspirators' capacitor manufacturing facilities are located). Although some of these events may have temporarily had some genuine effect on production, the nature and extent of that impact was exaggerated by Conspirators to account for their artificially constrained supplies of Affected Capacitors and increased prices.

145.    Additionally, Conspirators would allocate market shares among themselves through coordinated bid-rigging. Conspirators supposedly competing for the same customers would decide in advance which Conspirator would "win" the bidding, and at what price, allowing the cartel to structure bidding in advance to ensure the Conspiracy's desired prices. As a result of Conspirators' bid-rigging, customers were prevented from negotiating competitive prices for the products they purchased and were forced to pay Conspirator's collusive overcharges.

**B.      Conspiratorial Meetings**

146.    At least by 2001 and continuing throughout the Conspiracy Period, certain Conspirators attended regular and ad hoc meetings in which sensitive competitive information regarding Capacitors was exchanged and minimum prices were set.

147.    Each of these meetings constituted overt acts in furtherance of the Conspiracy.

148.    These meetings were an outgrowth of regular industry gatherings dating back to the 1980s in which the participants exchanged historical summary pricing and sales data.

149.    Based on the information disseminated and agreements reached at these different cartel meetings, the Conspirator attendees agreed to price Affected Capacitors collusively, stand united against price reduction demands, and set production and delivery dates to collusively control supply in the Affected Capacitors markets.

150.    Meeting rosters and notes indicate that Defendants Nippon Chemi-Con, ELNA, Matsuo, Nissei, Nitsuko, Okaya, Shinyei, Shizuki, Soshin, Taitsu, and TOSHIN KOGYO participated in, were informed of, and/or were discussed at, the cartel's regular meetings.

151.    The participants at these cartel meetings generally represented their corporate families on the whole and did not make known to the other participants any divisions in interest between the various affiliated entities on whose behalf they appeared.

152.    All participants understood that the other participants in cartel activities entered into agreements and understandings with one another on behalf of all entities within their respective corporate enterprises.

153.    As such, participants in meetings, communications, and other activities undertaken to effectuate the Conspiracy were agents of, and made commitments for, their full corporate families.

154.    This is reflected in records of meetings throughout the Conspiracy Period, which do not distinguish between entities or officers within a single corporate enterprise or corporate family. Instead, membership rosters, reports, and minutes from cartel meetings identify corporate

enterprises, usually by the abbreviated name of the ultimate corporate parent (for example, "ELNA," "Hitachi," and so on).

155.    Certain cartel meeting participants held multiple positions with both their parent companies and the parent's subsidiaries, underscoring the fact that their conspiratorial actions were simultaneously undertaken for the benefit of various corporate affiliates. For example:

(a)    Zenichiro Uehara—General Manager for Soshin Co.'s Sales Department who served as both President and a Managing Director of Soshin America— attended JFC meetings.

(b)    Takehisa Okumura—General Manager and Sales Supervisor of Shinyei Tech, who served as both President and Chairman of the Board of Shinyei America—also attended JFC meetings.

156.    Nippon Chemi-Con, Rubycon, Hitachi, ELNA, and Matsuo each played a key role in organizing the cartel's regular meetings and coordinating the operation of the cartel during the Conspiracy Period. Each of these Conspirators manufactured both electrolytic capacitors (i.e., aluminum and/or tantalum) and film capacitors and had global presence in the Affected Capacitors markets. Conspirators, including Defendant Nippon Chemi-Con and co-conspirators Rubycon and Hitachi, regularly attended cartel meetings where attendees fixed prices for both electrolytic and film capacitors. This overlap of membership between the electrolytic and film capacitors groups allowed the Conspirators involved in the cartel to integrate and coordinate their collusive efforts.

157.    Cartel meetings took various forms and were known by various names throughout the Conspiracy Period.

158.     Between at least 2001 and 2003, Conspirators, including Nichicon, ELNA, Nippon Chemi-Con, and Rubycon, attended periodic regional group meetings, including the KCC Meetings (regarding sales in the Kangai region of Japan), and Hananoki meetings (regarding sales in the Hananoki region of Japan). During these meetings, sales and production statistics and sensitive market information were shared.

159.     "ECC" (Electrolytic Capacitor Company) Meetings also occurred regularly throughout this period. There were two types of ECC Meetings: monthly meetings that were attended by managerial-level employees and biannual meetings attended by upper-level executives. Conspirators, including Nichicon, ELNA, Rubycon, and Nippon Chemi-Con, regularly attended these ECC Meetings.

160.     ECC Meetings included discussions about individual and collective pricing of aluminum capacitors. Members would complain if other members were pricing their products too low.

161.     The Foreign Trade Committee of the ECC discussed overseas business, including pricing for those markets. Attendees of the Committee meetings agreed to restrain trade on a global basis, including with respect to U.S. sales. Conspirators, including ELNA, Nippon Chemi-Con, Rubycon, and Nichicon, regularly attended these meetings.

162.     "TC" (Tantalum Capacitors) Meetings were held from at least 2001 – 2003. These meetings also involved pricing discussions and the exchange of sensitive competitive information. Conspirators, including Hitachi, Nippon Chemi-Con, Matsuo, and Nichicon regularly attended these TC Meetings.

163.     An organizational chart reflects the Chair Companies and Audit Companies for the TC Meetings. Included on the chart were Defendants ELNA, Nippon Chemi-Con and Matsuo, as well as co-conspirators Hitachi and Nichicon. A 2002 TC Meeting Trade Committee Roster reflects the same members.

164.     In 2003, the ECC and TC Meetings were combined, resulting in regular "ATC" (Aluminum Tantalum Capacitors) meetings, at which Defendants ELNA, Nippon Chemi-Con, and Matsuo, and co-conspirators Hitachi, Rubycon, and Nichicon, were regular participants.

165.     An ATC Meeting Members Roster as of July 16, 2003 identifies ELNA, Matsuo, and Nippon Chemi-Con, as well as co-conspirators Hitachi, Rubycon, and Nichicon. An ATC Meeting President Committee Roster as of the same date lists the same companies.

166.     In 2005, the ATC Meetings were renamed the "MK" (Marketing) or Market Study Group Meetings. These ATC/MK Meetings were held periodically through at least 2013. Conspirators, including Nippon Chemi-Con, Rubycon, Matsuo, and Hitachi, regularly attended these MK Meetings.

167.     Monthly ATC/MK Meetings were attended by manager-level employees of Conspirators, including Defendants ELNA, Matsuo, and Nippon Chemi-Con, and co-conspirators Hitachi, Rubycon, and Nichicon. These meetings focused on the exchange of competitively sensitive data, such as production and sales volumes, current and future excess capacity, current and future pricing, raw material pricing and access issues, as well as various other statistics. Representatives of each Conspirator in attendance would make a presentation regarding his company's sales situation.

168.     Biannual ATC/MK meetings were attended by the Conspirators' high-level executives. During these meetings, each company's executive would give a formal presentation regarding the current market landscape for their products, complete with current and historical sales performance and profitability data for both Japanese and overseas markets (including the U.S.), current customer requests, industry trends, and future pricing and production intentions for aluminum and tantalum capacitors. During these meetings, participants would frequently recommend inflated prices to be implemented by the other cartel members.

169.     During these meetings, Conspirators also discussed and agreed on the uniform denial of customers' price reduction requests, and how such denials should be handled and justified, as well as the uniform prices to be charged.

170.     An "Overseas Trade Sectional Meeting" of the "ATC Group" was formed at least as early as 2003. The attendees at these meetings discussed sales of aluminum and tantalum capacitors in non-Japanese markets (i.e., including the United States), and prices were mutually agreed upon among the participants. Conspirators, including Defendants ELNA, Matsuo, and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, participated in the "Overseas Trade Sectional Meeting" discussions.

171.     Meeting minutes from the August 31, 2003 joint session of the Overseas Trade Sectional Meeting of the ATC Group provided the following mission statement: "The purpose of the meeting is to exchange information by market and by capacitor category so that each company will be able to enjoy profits and that healthy market prices will be maintained."

172.    These same minutes reflect specific discussions of U.S. sales, noting the stagnation of ELNA's U.S. business, but also noting that "GM is enjoying brisk sales (Business circumstances vary among Big 3)."

173.    Beginning in 2002 and extending through at least 2009, Conspirators, including Defendants ELNA and Nippon Chemi-Con and co-conspirator Rubycon regularly attended Singapore ATC meetings. At these meetings the Conspirators exchanged confidential production, market, and pricing information regarding electrolytic capacitors, including prices relating to electrolytic capacitors sold to specific customers.

174.    Beginning as late as 2006 and extending through at least 2008, Conspirators, including Nichicon, Rubycon, Hitachi, and Defendants ELNA and Nippon Chemi-Con, regularly attended CUP meetings. A representative from Rubycon stated that the purpose of the CUP meetings was to agree on increasing the prices of electrolytic capacitors.

175.    From at least 2002 to at least 2014, Conspirators also attended "JFC" (Japanese Film Capacitors) meetings every few months.

176.    During these JFC meetings, each Conspirator in attendance reported its sales situation and market conditions to its competitors. As part of these "market reports," Conspirators presented and exchanged past, current, and estimated future sales performance data in a format specified by the meeting organizer. This format often called for global performance data and comparisons of performance across various quarters and years.

177.    Each month, JFC participants exchanged "Self-Statistical Data" that was aggregated and reported to the group. Biannually, JFC participants submitted "Sector-Based Shipment Performance Data" that was aggregated and reported to the group.

178.    At JFC meetings, Conspirators also shared information on general market trends and conditions, including tough downward pressure on prices, demand, applications, customers (including U.S. customers), inventory levels, and sales trends in particular end products. Individual pricing and profits data regarding film capacitors was shared and participants agreed on concerted price increases.

179.    Additionally, JFC members sometimes discussed aluminum and tantalum capacitors at these meetings.

180.    A 2008 JFC Membership List reflects that the following Defendants were members: Okaya, Shinyei, Soshin, Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, Nippon Chemi-Con.

181.    Members were made aware of these meetings through periodic meeting notices, which set forth the current member companies and the logistical details and substantive agendas for the JFC meetings. JFC meeting notices issued between 2002 and 2014 reflect the following JFC members who participated in these anti-competitive meetings: Okaya, Shizuki, Shinyei, Soshin, Taitsu, TOSHIN KOGYO, Nichicon, Nissei, Nippon Chemi-Con, Nitsuko, Hitachi, Matsuo, and Rubycon.

182.    Specific examples of collusive activity that occurred at the Conspirators' regular cartel meetings include:

(a) Conspirators, including Nichicon and Rubycon and Defendants Nitsuko, Taitsu, TOSHIN KOGYO, Shizuki, Hitachi, Soshin, and Shinyei, attended cartel meetings held during the 3rd Quarter of 2002. At the meetings, Conspirator attendees discussed, among other things, demand for film capacitors in the United States, and exchanged competitively sensitive, non-public information concerning volumes of sales and shipments for products that used film capacitors.

(b)      Conspirators, including Hitachi, Nichicon and Defendants Nitsuko, Soshin, Shizuki, Nippon Chemi-Con, TOSHIN KOGYO and Okaya attended cartel meetings held during the 4th Quarter of 2002. At these meetings, Conspirator attendees discussed, among other things, specific Conspirators' recent and historical pricing for tantalum capacitors and their strategies regarding price increases.

(c)      Conspirators, including Defendants Nitsuko, Soshin, Nippon Chemi-Con, TOSHIN KOGYO, Shizuki, Taitsu, and Nissei, and co-conspirators Nichicon, Rubycon, and Hitachi, attended cartel meetings held during the 1st Quarter of 2003. At these meetings, Conspirator attendees discussed, among other things, business conditions in the United States, and competitively sensitive, non-public information concerning demand for film and electrolytic capacitors.

(d)      Conspirators, including Defendants Nitsuko, Soshin, Shinyei, Nippon Chemi-Con, TOSHIN KOGYO, Taitsu, and Nissei, and co-conspirators Nichicon, Rubycon, and Hitachi, attended a JFC meeting on February 21, 2003. At that meeting, Nippon Chemi-Con discussed its U.S. customers, in particular the American automotive manufacturers. Taitsu explained that the cost of film capacitors in the U.S. had decreased. Nissei also discussed the American market for Capacitors. Nichicon likewise discussed overseas markets for Capacitors. The Conspirator attendees at this meeting exchanged competitively sensitive, non-public information concerning tantalum and film capacitors.

(e)      Conspirators, including Defendants Nitsuko, Soshin, Taitsu, Nissei, TOSHIN KOGYO, Nippon Chemi-Con, and Shizuki, as well as co-conspirator Hitachi, attended cartel meetings held during the 2nd Quarter of 2003. At these meetings, Conspirator attendees

discussed, among other things, the volumes of film capacitors they had shipped and the prices per unit, and anticipated increases in Affected Capacitor prices. At a May 15, 2003 ECC Meeting attended by Defendants Nippon Chemi-Con and ELNA, as well as Hitachi, Rubycon, and other Conspirators, Rubycon expressed its hope that "every company will work towards sustaining prices mutually."

(f)     Conspirators, including Defendants Nippon Chemi-Con, ELNA, and Matsuo, and co-conspirators Nichicon, Rubycon, and Hitachi, attended cartel meetings held during the 3rd Quarter of 2003. At these meetings, Conspirator attendees discussed, among other things, their common goals to maintain high prices for Affected Capacitors and prices of Affected Capacitors for U.S. automotive manufacturers.

(g)     Conspirators, including Defendants ELNA and Nippon Chemi-Con and co-conspirators Nichicon and Hitachi attended a cartel meeting held on November 27, 2003. At this meeting, the Conspirator attendees discussed, among other things, price requests for specific customers.

(h)     Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirators Nichicon, Rubycon, and Hitachi, attended an ATC Meeting on March 17, 2004. At this meeting, Nippon Chemi-Con stated that it "would like to avoid competition" and "ask for cooperation." It further requested to "hear each company's trend, and by matching our pace with them, we would like to use it as a reference to be able to sell the product at as high a price as possible." Another participating Conspirator likewise asked "each company to avoid unnecessary competition." Rubycon discussed a 5% price increase for certain capacitors products.

(i)    Conspirators, including Nichicon and Hitachi and Defendants Nissei, Soshin, Taitsu, Nitsuko, TOSHIN KOGYO, Nippon Chemi-Con, and Shinyei, attended cartel meetings held during the 2nd Quarter of 2004. At these meetings, Conspirator attendees discussed, among other things, specific Conspirators' anticipated price increases to export customers.

(j)    At a May 13, 2004 ATC meeting attended by Rubycon and Defendants Nippon Chemi-Con, ELNA, and Hitachi (along with other Conspirators), Nippon Chemi-Con warned that "by thoroughly discussing the matters that we can discuss, we need to absolutely avoid gratuitous price decreases." Rubycon urged that "cooperating and exchanging information are important in order to maintain prices."

(k)    Conspirators, including Defendants ELNA and Nippon Chemi-Con, and co-conspirators Rubycon and Hitachi, attended a cartel meeting held on August 27, 2004. At this meeting, the Conspirator attendees discussed, among other things, demand for certain electrolytic capacitors in Japan and certain overseas Markets.

(l)    Conspirators, including Hitachi and Defendants Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, and Nippon Chemi-Con attended cartel meetings held during the 4th Quarter of 2004. At these meetings, Conspirator attendees discussed, among other things, overseas conditions for the market for film capacitors. A Soshin representative was unable to attend the December 3, 2004 JFC meeting due to "an urgent business trip to the U.S."

(m)    Conspirators, including Defendants ELNA, Matsuo, Taitsu, Nippon Chemi-Con, Nissei, Nitsuko, Soshin, TOSHIN KOGYO, and Shinyei, as well as co-conpirators Hitachi and Rubycon, attended cartel meetings held during the 2nd Quarter of 2005. At these meetings,

Conspirator attendees discussed, among other things, certain Conspirators' refusal to lower prices in response to a request from large customers.

(n)      Conspirators, including Defendants Nissei, Nitsuko, Soshin, Nippon Chemi-Con, ELNA, Taitsu, TOSHIN KOGYO, Shinyei, and Matsuo, as well as Hitachi and Rubycon, attended cartel meetings held during the 3rd Quarter of 2005. At these meetings, Conspirator attendees discussed, among other things, coordinating pricing for Affected Capacitors in the 3rd and 4th Quarters of 2005.

(o)      Conspirators, including Defendants Nippon Chemi-Con, ELNA, and Matsuo, attended cartel meetings held during the 4th Quarter of 2005, including on December 8, 2005. At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales. Each Conspirator attending the December 8, 2005 JFC meeting reported its market conditions, including: "[n]umber of orders received (July to Sep) compared to the same period of the previous year and Apr to Jun of 2005 (1Q)[;] Number of orders received in October compared to the same month of the previous year and Apr to Sep of 2005[;] Circumstances in November and estimate for December compared to the number of orders received in October[;] Market sentiment - Comments on favorable market and unfavorable market to your company."

(p)      Conspirators, including Defendants Hitachi, TOSHIN KOGYO, Okaya, Taitsu, Shinyei, Nitsuko, Nissei, and Soshin, attended cartel meetings held during the 1st Quarter of 2006. At these meetings, Conspirator attendees discussed, among other things, market conditions, pricing intentions, plans with respect to entering or not entering specific market sectors, and information shared at trade association meetings.

(q)      Conspirators, including Hitachi and Defendants Nippon Chemi-Con, ELNA, and Matsuo, attended cartel meetings held during the 2nd Quarter of 2006. At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(r)      Conspirators, including Hitachi and Defendants Nippon Chemi-Con, ELNA, and Matsuo, attended cartel meetings held during the 3rd Quarter of 2006. At these meetings, Conspirator attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Capacitors sales.

(s)      At a September 14, 2006 JFC Meeting, the Passive Components Business Committee gave a report concerning the "Product-Based Information Exchange Meetings." Each attending Conspirator reported on industry trends and its own market conditions. These reports followed a method established at an August 30, 2006 JEITA meeting, specifically: "Apr to Jun 2006 compared to the previous year[;] July 2006 compared to the average of Apr to Jun 2006[;]" and "Estimation[s] of Aug 2006. . . September . . . Oct to Dec 2006 . . . Jan to Mar 2007 compared to Apr to June 2006" (Q2). The attending Conspirators gave their market reports according to a similar format at all subsequent JFC meetings, through at least January 2014.

(t)      Conspirators, including Defendants Okaya, Taitsu, Nissei, Nippon Chemi-Con, Soshin, ELNA, and Matsuo, as well as co-conspirator Hitachi, attended cartel meetings held during the 4th Quarter of 2006. At these meetings, Conspirator attendees discussed, among other things, domestic and global capacitor market share and conditions.

(u)      At an October 19, 2006 SM or "Five Company" Meeting attended by Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirators Nichicon

and Rubycon, attendees discussed price increases of up to 15% for various capacitors products and customers. ELNA reported that it had been able to raise prices for 60% of its non-Japanese customers. Another attendee reported that it had been negotiating for a 10-15% increase with North American companies, and had already succeeded in raising prices by 5-7%.

(v)      Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirators Rubycon and Nichicon, attended an SM Meeting held on January 24, 2007. At this meeting, Conspirator attendees discussed their sales volumes and outlooks and price increases of up to 18% for various capacitors products and customers. Rubycon instructed the attendees that "[a]ll companies need to work hard to increase prices."

(w)      Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirators Rubycon and Nichicon, attended a cartel meeting held in March 2007. At this meeting, Conspirator attendees exchanged information and discussed, among other things, the demand for certain aluminum electrolytic capacitors.

(x)      Conspirators, including Defendants Nippon Chemi-Con, ELNA, Matsuo, Okaya, Soshin, Taitsu, Nissei, Nitsuko, Shinyei, and TOSHIN KOGYO, attended cartel meetings held during the 2nd Quarter of 2007. At these meetings, Conspirator attendees discussed, among other things, market conditions for film capacitors by appliance.

(y)      Conspirators, including Defendants Okaya, Soshin, Taitsu, Nissei, Nitsuko, and Shinyei attended a cartel meeting held on April 13, 2007. At this meeting, Conspirator attendees discussed, among other things, sensitive sales and production figures.

(z)      Conspirators, including Defendants Matsuo, Nissei, Nippon Chemi-Con, Nitsuko, Soshin, TOSHIN KOGYO, and Shinyei, attended cartel meetings held during the 3rd

Quarter of 2007. At these meetings, Conspirator attendees discussed, among other things, the cartel's agreement to increase prices. An Okaya memo from this period entitled "NSC, SPQ sales price increase progress situation" discussed several Conspirators' efforts to raise prices for specific customers and products. This memo noted that "[f]or power capacitor, Nichicon and Shizuki have raised price since fiscal 2006."

(aa)    Conspirators, including Defendants Nissei, Nippon Chemi-Con, Nitsuko, Soshin, TOSHIN KOGYO, and Shinyei, attended a cartel meeting on July 19, 2007. At this cartel meeting, Conspirator attendees received a report from the "Product-Based Information Exchange Meetings." Each Conspirator in attendance also gave a report concerning industry trends and its own market conditions, including individual "Performance from Apr 2005 to Mar 2006 against this year's budget (%) (global/domestic)" and "Performance from Jan to Mar 2006" against that of "Jan to Mar 2007 (global/domestic)[,] . . Apr to Jun 2007 (global/domestic)[,] . . estimate of July 2007 (global/domestic)[,] . . estimate of Aug 2007 (global/domestic)[,] . . estimate of Aug 2007 (global/domestic)[,] . . estimate of Sep 2007 (global/domestic)[,] . . . estimate of 3Q 2007 (global/domestic)[.]"

(bb)    Conspirators, including Defendants Nippon Chemi-Con, ELNA, Taitsu, Nitsuko, Okaya, Soshin, TOSHIN KOGYO, Shinyei, and Nissei, as well as co-conspirators Rubycon and Hitachi, attended cartel meetings held during the 4th Quarter of 2007. At these meetings, Conspirator attendees discussed, among other things, their plans to increase film capacitor prices, despite customer requests for price reductions. The Conspirator attendees also discussed specific pricing intentions regarding specific customers.

(cc)     Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirators Rubycon and Nichicon, attended a cartel meeting held during January, 2008. At this meeting, Conspirator attendees exchanged sensitive information regarding North American sales and the demand for certain aluminum electrolytic capacitors.

(dd)     Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirators Rubycon and Nichicon, attended a cartel meeting in April, 2008. At this meeting, Conspirator attendees exchanged sensitive pricing information and production figures. The Conspirator attendees also discussed demand forecasts and factory capacity information.

(ee)     Conspirators, including Hitachi and Defendants TOSHIN KOGYO, Soshin, Nitsuko, Nissei, Okaya, Taitsu, and Shinyei, attended cartel meetings held during the 2nd Quarter of 2008. At these meetings, Conspirator attendees discussed, among other things, customer pricing, including implementing price hikes and international market conditions. Specifically, certain of the Conspirator attendees agreed to stabilize prices and resist customer efforts to request price reductions.

(ff)     Conspirators, including Defendants ELNA, Matsuo, and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, attended a Presidents' Meeting on June 4, 2008. Each Conspirator sent a high-level executive to this cartel meeting. At this meeting, Conspirator attendees exchanged sensitive pricing information, including information regarding pricing requests from specific customers.

(gg)     Conspirators, including Defendants Nippon Chemi-Con, Matsuo, and ELNA, as well as co-conspirators Rubycon and Hitachi, attended an MK meeting on July 10, 2008. Conspirator attendees discussed their companies' Affected Capacitors production and sales

statistics and current and future pricing information, as well as market and product trends affecting production costs and demand. The participants agreed to collective price increases for ECAP manganese tantalum capacitors. A report from that meeting states: "A request for cooperation has been made in relation to price of, and the mark-up (differences between the domestic and international prices) of halogen-compatible ECAP/OS-CON [aluminum capacitors]."

(hh)    Conspirators, including Defendants Nissei, Okaya, Taitsu, Shinyei, Soshin, and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, attended a JFC Meeting on September 16, 2008. At the meeting, Conspirator attendees discussed sales and production trends and data and status reports regarding price hike negotiations with customers of film capacitors. A report of that meeting entitled "Movements of Other Companies" details the sensitive competitive information exchanged at this meeting and states, in part, "[w]e decided to accept the film price hike effective on April 1."

(ii)    Conspirators, including Defendants Nippon Chemi-Con, Matsuo, and ELNA, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting on October 8, 2008. Conspirator attendees presented their respective Affected Capacitors sales data and agreed that the market conditions were poor and sales would significantly decrease in the remainder of the year. Firms agreed that struggling to improve their businesses would only cause further decreases in prices and profitability, but that constraining supply of Affected Capacitors would allow them to demand higher prices. Downward sales forecasts for North America were specifically discussed.

(jj)    Conspirators, including Defendants Nissei, Taitsu, Shinyei, Okaya, Soshin, Nippon Chemi-Con, Matsuo, and ELNA, as well as co-conspirators Rubycon and Hitachi, attended

cartel meetings during the 4th Quarter of 2008. At these meetings, Conspirator attendees discussed, among other things, implementing film capacitor price increases, current production status, market conditions in foreign markets, including North America, and ending price competition on film capacitors.

(kk)    Conspirators, including Defendants Okaya, TOSHIN KOGYO, Nissei, Nippon Chemi-Con, Nitsuko, Shinyei, Soshin, and Taitsu, attended a JFC Meeting on February 13, 2009. At this meeting, Conspirator attendees exchanged sensitive sales and profits data and discussed future pricing intentions.

(ll)    Conspirators, including Defendants Matsuo, ELNA, and Company "NC" (Nippon Chemi-Con), as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in April 2009. Conspirator attendees discussed product and industry specific demand levels. In particular, participants discussed current demand levels for Affected Capacitors in the United States, including as a function of the performance of major U.S. automobile manufacturers ("Car-related demand may fall in and after May if things do not go well for the Big Three of the United States").

(mm)    Conspirators, including Defendants Shinyei, Okaya, Nitsuko, Nippon Chemi-Con, Toshin, Taitsui, and Nissei, attended a JFC meeting in April of 2009. At this meeting, attendees reported internal sales forecasts and discussed sales trends and demand levels for various products, including medical related equipment, solar products, heating equipment, air conditioning equipment, cell phones, personal computers, TVs, and wiring-related products.

(nn)    Conspirators, including Defendants Matsuo, ELNA, and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in May 2009.

Conspirator attendees discussed their companies' respective production and demand levels and diminishing MLCC prices. Participants noted that business in the U.S., "where demand arises principally for industrial machinery, equipment, and cars," was "in a slump."

(oo)　　Conspirators, including Defendants Matsuo, ELNA, and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in June 2009. Conspirator attendees discussed widespread under-supply of aluminum capacitors as a result of their concerted supply constraint.

(pp)　　Conspirators, including Defendants Matsuo and ELNA, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in July 2009. Conspirator attendees discussed individual current and anticipated sales volumes and pricing structures and corrections. Rubycon noted that it still enjoyed brisk overseas demand.

(qq)　　Conspirators, including Defendants Taitsu, Nippon Chemi-Con, Okaya, TOSHIN KOGYO, and Nissei, attended a JFC meeting on July 22, 2009. Conspirator attendees shared detailed information regarding their domestic and foreign orders for Affected Capacitors and discussed the Conspirators' overseas sales and demand for products containing film capacitors. These Conspirators also shared competitively sensitive actual and estimated sales performance data for their companies, both from "worldwide and domestic perspectives."

(rr)　　Conspirators, including Defendants ELNA and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in August 2009. Conspirator attendees discussed collectively maintaining E-CAP production at 70% of each company's capacity, which had effectively reversed the supply-demand imbalance, allowing Conspirators to continue to "choose or reject each order" as "all manufacturers have order backlogs" and the

"demand-supply situation [was] tight." Participants chastised Nippon Chemi-Con for cheating on applicable price-fixing agreements.

(ss)    Conspirators, including Defendants ELNA, Matsuo, and Nippon Chemi-Con, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in September 2009. Conspirator attendees discussed "price recovery activities" for combatting the strong yen and high crude oil prices. As usual, participants also exchanged sensitive competitive information pertaining to their respective pricing, demand, and profitability. Rubycon noted that it would push "price recovery negotiations" for "US$ basis customers."

(tt)    Conspirators, including Defendants Nippon Chemi-Con, Matsuo, and ELNA, as well as co-conspirators Rubycon and Hitachi, attended an MK Meeting in October 2009. Conspirator attendees discussed their current pricing, profitability, and sales trends in particular industries and markets, including the United States. A Conspirator noted that it had "[a]lready raised prices by 150% [on manganese tantalum capacitors], and it came to a profitable level price-wise." Company "NC" (Nippon Chemi-Con) stated that the US market was "in a trend of upward adjustments on every prospect review. . . . for U.S. automotives, short delivery period back orders are stacking up." ELNA reported that its ECAP aluminum capacitors sales "[f]or U.S. automotives" were "in a situation of being transported by air through Fedex every week."

(uu)    Conspirators, including Defendants Nippon Chemi-Con, Matsuo, and ELNA, as well as co-conspirators Rubycon and Hitachi, attended an MK meeting in November 2009. A report of the meeting states, "[a]lthough all companies are in a good atmosphere in terms of order reception, profit hasn't been made due to the effects of exchange rates. Price increase has been on the topic. There is intention for increasing prices of aluminum polymer (rolled-up type)

but no such talk on tantalum polymer." Nippon Chemi-Con reported that it was "conducting negotiations for price increase mainly with overseas customers." Participants exchanged sensitive competitive information regarding current and future pricing for various aluminum and tantalum capacitor models.

(vv)    Conspirators, including Defendants Matsuo and ELNA, and co-conspirator Rubycon, attended an MK Meeting on February 18, 2010. At this meeting, the Conspirator attendees exchanged sensitive information regarding demand for certain electrolytic capacitors in certain overseas markets.

(ww)    Conspirators, including Defendants Nippon Chemi-Con, Matsuo, ELNA, Okaya, Taitsu, TOSHIN KOGYO, Shinyei, and Nissei, and co-conspirator Rubycon, attended cartel meetings held in the 2nd Quarter of 2010. At these meetings, Conspirator attendees discussed, among other things, their current sales data, current pricing information, industry and specific customer demands and trends, capacity, future Affected Capacitors production intentions, and costs of raw materials.

(xx)    Conspirators, including Defendants Nippon Chemi-Con, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, and co-conspirator Rubycon, attended cartel meetings held in the 3rd Quarter of 2010. At these meetings, Conspirator attendees discussed, among other things, drastic price increases in prices of Affected Capacitors.

(yy)    Conspirators, including Defendants Matsuo, ELNA, and Nippon Chemi-Con, and co-conspirator Rubycon, attended an MK Meeting on November 15, 2010. At this meeting, Conspirator attendees discussed, among other things, sensitive information regarding demand for electrolytic capacitors in overseas markets.

(zz)    Conspirators, including Defendants Nippon Chemi-Con, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, and co-conspirator Rubycon, attended cartel meetings held in the 4th Quarter of 2010. At these meetings, Conspirator attendees discussed, among other things, large increases in the prices of film capacitors, and refusing to do business with customers who did not accept the increase.

(aaa)    Conspirators, including Defendants Nippon Chemi-Con, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei, and co-conspirator Rubycon, attended cartel meetings held in the 1st Quarter of 2011. At these meetings, Conspirator attendees discussed, among other things, industry trends, information shared at JEITA meetings, and coordinating their activities at the highest levels through regular meetings of senior officials in charge of Affected Capacitors sales.

(bbb)    Conspirators, including Defendants Okaya, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, and Shinyei, attended cartel meetings held in the 3rd Quarter of 2011. At these meetings, Conspirator attendees discussed, among other things, order flow for film and aluminum capacitors, and price increases imposed for film capacitors used in televisions.

(ccc)    Conspirators, including Defendants Okaya, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, Shinyei, Nissei, and Nitsuko, attended cartel meetings held in the 4th Quarter of 2011. At these meetings, Conspirator attendees discussed, among other things, profits obtained due to higher prices imposed over the last year, and vowed to each other to not cut prices despite competition from Taiwanese and Korean capacitor manufacturers.

(ddd)    Conspirators, including Defendants Okaya, Nippon Chemi-Con, Nissei, Taitsu, TOSHIN KOGYO, Shinyei, and Soshin, and co-conspirator Hitachi, attended cartel

meetings held in the 1st Quarter of 2012. At these meetings, Conspirator attendees discussed proposed increases in prices of film capacitors, and demand for products that utilize film and aluminum capacitors.

(eee)   Conspirators, including Defendants Okaya, Nissei, Taitsu, Shinyei, Soshin, and TOSHIN KOGYO, attended a cartel meeting on March 13, 2012. At this meeting, Conspirator attendees discussed sales figures and production information.

(fff)   Conspirators, including Defendants Taitsu, Nissei, Shinyei, Okaya, Nippon Chemi-Con, and TOSHIN KOGYO, attended a cartel meeting in May, 2012. At this meeting, Conspirator attendees discussed pricing information, including the Conspirators' general consensus that prices were too low, as well as decreased production figures and general market conditions.

(ggg)   Conspirators, including Defendants Nippon Chemi-Con and ELNA, and co-conspirator Rubycon, attended an MK Meeting on January 25, 2013. At this meeting, Conspirator attendees shared detailed information regarding their productions for Affected Capacitors and discussed, among other thing, sensitive device production trends and demand for electrolytic capacitors in overseas markets.

(hhh)   Conspirators, including Defendants Matsuo, ELNA, and Nippon Chemi-Con, and co-conspirator Rubycon, attended an MK Meeting on May 21, 2013. At this meeting, Conspirator attendees shared detailed information regarding their productions for Affected Capacitors and discussed, among other thing, sensitive information regarding unit prices for particular customers, sales figures, and demand for electrolytic capacitors in overseas markets.

(iii)     Conspirators, including Defendants Matsuo, ELNA, and Nippon Chemi-Con, and co-conspirator Rubycon, attended an MK Meeting on November 22, 2013. At this meeting, Conspirator attendees discussed, among other thing, sensitive information regarding demand for electrolytic capacitors in overseas markets.

(jjj)     Conspirators, including Defendants Nippon Chemi-Con, ELNA, and Matsuo, and co-conspirator Rubycon, attended an MK Meeting on January 24, 2014. At this meeting, Conspirator attendees discussed, among other thing, sensitive information regarding demand for electrolytic capacitors in overseas markets.

183.   Throughout the Conspiracy Period, smaller meetings were held on an ad hoc basis among subsets of Conspirators with common customers. These meetings often occurred when a customer was asking for a price reduction. The company with the largest share for that customer would invite its competitors to determine a satisfactory price.

184.   For example, in the first quarter of 2014, Shinyei had a "cooperation meeting" with the general manager of sales at Shizuki, to discuss capacitors pricing and profit margins, in particular with respect to industrial machinery products.

185.   Both during and after these periodic cartel meetings and ad hoc bilateral or multilateral meetings, the participants communicated regarding how to avoid competing among themselves through concerted pricing, bid-rigging, and supply constraint, as well as how to convey their concerted manufacturing, delivery, and pricing changes to customers and the market.

### C.     Defendants' U.S.-Based Subsidiaries Marketed, Sold, and Delivered Their Parents' Price-Fixed Capacitors in Furtherance of the Conspiracy's Purpose

186.   When Conspirators reached agreements to fix, raise, maintain or stabilize prices, or constrain supply of Affected Capacitors—whether as a result of formal or informal cartel meetings,

ad hoc bilateral or multilateral meetings, or through other communications—they intended for their collusive agreements to impact the pricing and supply for all Affected Capacitors, including those sold in the United Sates.

187.    Each Defendant sold its capacitors around the world, including to direct purchasers in the United States, like Plaintiff.

188.    The Japan-based Defendants having U.S. subsidiaries (Nippon Chemi-Con, ELNA, Okaya, Shinyei, Soshin, and Taitsu) established and acquired those subsidiaries not only to market, sell, and distribute their capacitors in the United States, but also to effectuate and achieve the Conspiracy's aims and purposes.

189.    These U.S. subsidiaries and affiliates are controlled by officers and managers in Japan and their prices are controlled by their Japan-based Defendant corporate parents.

190.    These U.S. subsidiaries had no authority to independently set competitive prices. Instead, they were bound by their foreign parents' conspiratorial price-fixing agreements (although it may be true that, from time to time, U.S.-based personnel had authority to charge higher prices that those set by the cartel).

191.    Because their Japan-based Defendant parents had significant control over all aspects of their business (e.g., Affected Capacitors' supply, pricing, business strategy, customer relations, sales, and personnel decisions), many of the U.S. subsidiaries operated as little more than sales offices in the U.S. for their respective Japan-based Defendant parents. Indeed, as set forth below, many of the Japan-based Defendant parents named their own employees directors, officers or managers of their U.S. subsidiaries, and many of these employees held the U.S. executive

positions without ever leaving Japan. As a result, these U.S. subsidiaries were, as intended, able to advance the cartel aims in the United States.

**D.** **UCC Advanced the Conspiracy's Aims and Purposes in the United States for Nippon Chemi-Con**

192.    During the Conspiracy Period, UCC, NCC's wholly-owned U.S. subsidiary, sold Nippon Chemi-Con aluminum, tantalum, and film capacitors to customers in North America.

193.    UCC's business and assets originate from NCC. UCC's website refers its visitors who want to search its products to NCC's website.

194.    UCC is governed by NCC's directors and other executives, and they appoint UCC's officers.

195.    NCC's customers do not distinguish between NCC and UCC. Often, customers referred to UCC as "NCC," and UCC personnel field inquiries about NCC's products.

196.    During the Conspiracy Period, UCC warehoused and sold millions of dollars in capacitor sales at NCC's direction. UCC was responsible for helping NCC distribute its capacitors in the United States, and NCC profited from UCC's sales efforts.

197.    In certain instances, NCC sold capacitors to UCC and shipped them to the United States with the understanding that the capacitors would then be purchased (or had already been purchased) by customers in the United States. NCC's shipping records dating from November 2012 until July 2014 show that NCC shipped tens of millions of dollars of capacitors to UCC and directly to U.S. customers.

198.     UCC provided NCC with monthly sales reports, listing budgets and projections that UCC provided to NCC, which NCC used to evaluate UCC's performance. During the Conspiracy Period, these reports were provided directly to NCC Directors, including Noriaki Kakizaki.

199.     NCC was responsible for the business relationships with the majority of the customers who purchased capacitors from UCC, or from NCC through UCC. NCC directors traveled to the U.S. to meet with large U.S.-based technology companies, including Apple and Bose, and electronic component distributors such as Digi-Key.

200.     NCC required UCC to obtain its approval on most decisions, including routine business decisions such as promotions of personnel. UCC was required to "obey" NCC and adhere to its financial and operational guidelines.

201.     Specifically, UCC needed the "consent" and "approval" of NCC for "[s]etting and revisions to standard prices" and "[w]holesale price setting guidelines and methods." Indeed, UCC needed the "consent" and "approval" of NCC for all important matters pertaining to legal or general affairs.

202.     Most of UCC's top executives were former or current NCC personnel, and many of these persons were paid in Japanese currency by NCC in Japan. NCC then charged UCC for payment of these salaries these salaries. UCC was severely undercapitalized. For example, in the 2010-2011 fiscal year, UCC claimed $87 million in sales, had less than $2 million in cash, and stayed afloat by obtaining low-interest loans from NCC.

203.     UCC was aware of Conspirators' unlawful agreements to sell capacitors at anticompetitive prices, and knowingly sold capacitors at inflated prices.

204.    UCC's President Tsuneo Ohta met with executives from other cartel members during the relevant time period. Ohta participated in multiple meetings with sales personnel from U.S. and Japanese subsidiaries of cartel members.

205.    Similarly, UCC employee Koichi Fumoto met with sales personnel from Conspirators including Hitachi and Nichicon.

206.    Documents produced from Mr. Ohta's files document at least one meeting of the ATC Group.

207.    UCC's top executives and managers were NCC personnel. Such personnel generally had duties to NCC, notwithstanding their nominal appointments and roles at UCC, and returned to NCC when NCC directed them to do so.

208.    At times during the Conspiracy Period, UCC received complaints from its customers that their prices on capacitors were too high. UCC personnel regularly "escalated" such complaints by forwarding them to NCC executives, including an NCC director, because UCC lacked the authority to lower prices of capacitors. The NCC executives had reason to know of cartel activity and cartel agreements on price and other issues.

209.    UCC was allowed to "consult" with NCC concerning departures from standard pricing for capacitors, as long as the sales were not "wholesale," but NCC had to approve these departures. Given the existence of the agreement among cartel members to keep prices high, it is more likely than not that UCC was informed of the reason it could not lower prices for customers for aluminum and tantalum capacitors.

210.    At times, cartel members reached out directly to UCC personnel concerning implementing the cartel's agreements, or to exchange information concerning pricing for

capacitors for U.S. customers. For example, in August 2005, a Conspirator employee based in California consulted UCC concerning the coordination of their bidding efforts during an online auction held by a U.S.-based PC manufacturer. The Conspirator employee directly communicated with UCC executive Masayuki Kudo. Mr. Kudo was an NCC employee prior to being assigned to work at UCC in the United States, and he returned to work at NCC in September 2012.

211.    Further, in December 2005, a Conspirator employee exchanged with UCC competitively-sensitive information concerning testing of capacitors for a bid for a U.S. customer.

E.      **Soshin America Advanced the Conspiracy's Aims and Purposes in the United States for Soshin Co.**

212.    Soshin America—Soshin Co.'s wholly-owned U.S. subsidiary identified on Soshin Co.'s website as one of its "Overseas Operations"—sells Soshin Co.'s film capacitors to customers in the United States.

213.    The vast majority of Soshin Co.'s capacitors sold into the United States are sold through Soshin America, with a limited amount sold through distributors or other authorized resellers.

214.    Soshin America does not manufacture any of Soshin's film capacitors sold in the United States; they are all manufactured overseas. Accordingly, Soshin America is dependent on Soshin Co. for the supply of capacitors it markets, sells, or delivers in the United States.

215.    Soshin's capacitor sales in the United States are directed and supervised by Soshin Co.'s sales department personnel resident in Japan. Accordingly, all sales planning, strategy, and pricing decisions relating to Soshin capacitors sold in the United States are made by Soshin Co. sales and management personnel in Japan, and Soshin America employees have no discretion or

authority to conduct business without authorization from Soshin Co.'s Japan-based sales department.

216.    From at least 1999 to 2014, nearly all of Soshin America's directors and officers concurrently held sales or management positions at Soshin Co.

217.    Soshin Co. personnel holding positions at Soshin America or doing business with the company's U.S. customers were knowledgeable about the existence of the Conspirators' cartel, as well as the cartel's aims and purpose.

218.    Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Soshin. During these discussions, Soshin's representatives and their fellow cartel members reported on available demand and pricing activity for various global regions, including information specific to the North American capacitor market. Soshin Co. used Soshin America to collect the information exchanged at these meetings.

219.    Information about Conspirators' price-fixing agreements were disseminated to the Soshin personnel holding positions at Soshin America or doing business with the company's U.S. customers by those who participated in cartel meetings.

220.    The Soshin personnel that participated in cartel meetings and activities held positions of authority within Soshin Co.'s sales and planning departments.

221.    Soshin Co.'s complete control over Soshin America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

F.    **Shinyei America Advanced the Conspiracy's Aims and Purposes in the United States for Shinyei Kaisha**

222.    Shinyei America—Shinyei Kaisha's U.S.-based wholly-owned subsidiary—sells Shinyei branded film capacitors to customers in the United States.

223.    Shinyei America does not manufacture any of Shinyei's film capacitors sold in the United States; they are all manufactured overseas by Shinyei Kaisha and other affiliates of Shinyei America, including Shinyei Capacitor and formerly Shinyei Tech. Accordingly, Shinyei America is dependent on Shinyei Kaisha to provide it with the capacitors it markets, sells, or delivers in the United States.

224.    The vast majority of Shinyei's capacitors sold into the United States are sold through Shinyei America.

225.    Shinyei's capacitors sales in the United States are directed and supervised by Shinyei sales department personnel resident in Japan. Accordingly, all sales planning, strategy, and pricing decisions relating to Shinyei's capacitors sold in the United States are made by Shinyei sales and management personnel in Japan, and Shinyei America employees have little to no discretion or authority to conduct business without authorization from Shinyei's Japan-based sales department.

226.    Shinyei Kaisha has regularly assigned key sales and management personnel from subsidiaries such as Shinyei Tech/Shinyei Capacitor to positions at Shinyei America. Personnel assigned to Shinyei America positions regularly perform those duties concurrently with their Shinyei Tech/Shinyei Capacitors duties. Some such personnel perform their Shinyei America duties from Shinyei offices in Japan and therefore are not physically present in the United States.

227.    Shinyei Tech/Shinyei Capacitor personnel holding positions at Shinyei America or doing business with the company's U.S. customers were knowledgeable about the existence of Conspirators' cartel, as well as the cartel's aims and purpose.

228.     Demand for Affected Capacitors in the United States was regularly discussed among cartel members, including Shinyei. During these discussions, Shinyei's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various regions, including information specific to the North American capacitor market. Shinyei used Shinyei America to collect the information exchanged at these meetings.

229.     Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to the Shinyei personnel holding positions at Shinyei America who supervised and oversaw Shinyei America sales staff or did business with the company's U.S. customers.

230.     The Shinyei personnel that participated in cartel meetings and activities held positions of authority within Shinyei Tech/Shinyei Capacitor.

231.     Shinyei's control of Shinyei America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

### G.     Okaya America Advanced the Conspiracy's Aims and Purposes in the United States for Okaya Co.

232.     Okaya America—Okaya Co.'s U.S.-based wholly-owned subsidiary—sells Okaya branded film capacitors to customers in the United States.

233.     Okaya America does not manufacture any of Okaya's film capacitors sold in the United States; they are all manufactured overseas by other Okaya entities. Accordingly, Okaya America is dependent on Okaya Co. to provide it with the capacitors it markets, sells, or delivers in the United States.

234.     All of Okaya's capacitors sold in the United States are sold through Okaya America.

235.    Okaya's capacitors sales in the United States are directed and supervised by Okaya Co.'s sales department personnel resident in Japan. For example, materials outlining Okaya's company-wide internal process controls indicate that any price quotations must be approved by the Okaya Co.'s Overseas Sales Group Leader. Accordingly, all sales planning, strategy, and pricing decisions relating to Okaya's capacitors sold in the United States are made or supervised by Okaya sales and management personnel in Japan and Okaya America employees have little to no discretion or authority to conduct business without authorization from Okaya's Japan-based sales department.

236.    Okaya Co.'s oversight of Okaya America's sales efforts and product pricing is in line with its overall close management of the U.S.-based subsidiary as one of its domestic sales offices.

237.    Okaya Co. has regularly assigned sales and management personnel to positions at Okaya America. Personnel assigned to Okaya America positions regularly perform those duties concurrently with their Okaya Co. duties. Some such personnel perform their Okaya America duties from Okaya offices in Japan and therefore are not physically present in the United States. Others work in the United States for a period of time, but eventually return to Japan to continue working for Okaya Co.

238.    Okaya Co. personnel holding positions at Okaya America or doing business with the company's U.S. customers were knowledgeable about the existence of Conspirators' cartel, as well as the cartel's aims and purpose.

239.    Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Okaya. During cartel meetings, Okaya's representatives and their

fellow cartel members reported on available demand and pricing activity for Affected Capacitors various global regions, including information specific to the North American capacitor market. Okaya used Okaya America to collect the information exchanged at these meetings.

240.     Information regarding the cartel's agreements concerning pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Okaya personnel holding positions at Okaya America who supervised and oversaw Okaya America sales staff or did business with the company's U.S. customers.

241.     Okaya Co.'s control of Okaya America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**H.     Taitsu America Advanced the Conspiracy's Aims and Purposes in the United States for Taitsu Corp.**

242.     Taitsu America also lacks corporate separateness from its parent, Taitsu Corp.

243.     Taitsu America does not manufacture any of Taitsu's film capacitors sold in the United States; they are all manufactured overseas by Taitsu Corp. or Taitsu Corp.'s other business units and subsidiaries. Accordingly, Taitsu America is dependent on Taitsu Corp. to provide it with the capacitors it markets, sells, or delivers in the United States.

244.     Virtually all of Taitsu's capacitors sold in the United States are sold through Taitsu America.

245.     Taitsu's capacitors sales in the United States are directed and supervised by Taitsu's sales department personnel resident in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to Taitsu's capacitors sold in the United States are made or supervised by Taitsu's sales and management personnel in Japan.

246.    Taitsu America does not have its own domain name. It appears on its parent's website only in its capacity as Taitsu Corp.'s American "Sales Office," accompanied only by contact information for the "office" and no further corporate details (http://www.taitsu.co.jp/english/hub/USA/index.html). The "History of Company" section of Taitsu Corp.'s website states that in 1997 it "[e]stablished distributor Taitsu America, Inc. in U.S.A."

247.    Taitsu Corp.'s website illustrates Taitsu America as an integral part of "Taitsu's Global Supply Network," which spans North America and Asia (http://www.taitsu.co.jp/english/hub/). Taitsu Corp.'s company profile stresses that Taitsu Corp. has "been proactive in overseas expansion of our business in anticipation of globalization. We now have bases in Japan and other parts of the world including the United States" (http://www.taitsu.co.jp/english/company/).

248.    Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including Taitsu. During cartel meetings, Taitsu's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors various global regions, including information specific to the North American capacitor market. Taitsu used Taitsu America to collect the information exchanged at these meetings.

249.    Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to Taitsu personnel holding positions at Taitsu America who supervised and oversaw Taitsu America sales staff or did business with the company's U.S. customers.

250.     Taistsu Corp.'s control of Taitsu America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

I.       **ELNA America Advanced the Conspiracy's Aims and Purposes in the United States for ELNA**

251.     ELNA America also lacks corporate separateness from ELNA Co.

252.     ELNA America does not manufacture any of ELNA's Affected Capacitors sold in the United States; they are all manufactured overseas by ELNA Co. or ELNA Co.'s other business units and subsidiaries. Accordingly, ELNA America is dependent on ELNA Co. to provide it with the capacitors it markets, sells or delivers in the United States.

253.     Virtually all of ELNA's capacitors sold in the United States are sold through ELNA America.

254.     ELNA's capacitors sales in the United States are directed and supervised by ELNA's sales department personnel resident in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to ELNA's capacitors sold in the United States are made or supervised by ELNA's sales and management personnel in Japan.

255.     ELNA America's "About Us" page asserts that it (a) has been a "wholly-owned subsidiary of ELNA Co. Ltd." for over 35 years; (b) is "responsible for sales, service, and support to customers in North and South America;" and (c) has customers in "all market segments of the electronics industry." The "Locations" webpage depicts a global network of ELNA Co.'s worldwide offices. The "Products" and "News" webpages directly link to the "Capacitors" and "News release" webpages of ELNA Co.'s website, respectively.

256.     ELNA Co.'s website (www.elna.co.jp/en/) likewise shows a lack of corporate separateness from ELNA America. ELNA Co.'s "Corporate profile & History" webpage states

that ELNA Co. established "ELNA AMERICA INC., as the sales company in the USA" in March 1977 (http://www.elna.co.jp/en/company/data.html). The "News release" webpage has posted consolidated balance sheets for ELNA Co. and its consolidated subsidiaries (including wholly-owned ELNA America) dating back to 2005.

257.     Unlike ELNA Co.'s website, ELNA America's website does not list an independent board of directors.

258.     Demand for Affected Capacitors in the United States was regularly discussed among Conspirators, including ELNA. During cartel meetings, ELNA's representatives and their fellow cartel members reported on available demand and pricing activity for Affected Capacitors in various global regions, including information specific to the North American capacitor market. ELNA used ELNA America to collect the information exchanged at these meetings.

259.     Information regarding the cartel's agreements regarding pricing and sales were disseminated by those who participated in, or were knowledgeable of, cartel meetings to ELNA personnel holding positions at ELNA America who supervised and oversaw ELNA America sales staff or did business with the company's U.S. customers.

260.     ELNA Co.'s control of ELNA America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

## VIII.   ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY

261.     Defendants' concerted and collusive actions as alleged herein artificially inflated the prices of Affected Capacitors in the U.S. and abroad.

262.    During the Conspiracy Period, Affected Capacitors prices decreased less than they would have under ordinary free market conditions, stabilized, and in some instances, even increased—despite the diminishing demand and worsening market conditions described above.

263.    As a result, Plaintiff and other purchasers collectively paid overcharges totaling hundreds of millions of dollars or more for trillions of capacitors purchased throughout the Conspiracy Period.

264.    In 2005, aluminum capacitors began to stop their price decline from approximately $55.06 per thousand in 2003. In 2005, industry data shows that the price per unit for aluminum electrolytic capacitors was $46.76 per thousand units, and the per-unit prices hovered between approximately $40.00 and $46.00 per thousand until 2013.

265.    In 2005, film capacitors demonstrated a price increase of nearly $1.63 per thousand units from 2004, and the per unit price continued to rise on most types of film capacitors until at least the beginning of 2009, after which the price of film capacitors declined at times, though this decline was less severe than it would have been in an unfettered market due to the Conspirators' cartel.

266.    Economic analysis of the impact of the cartel is in its earliest stage, and much of the relevant information is in the possession and control of Conspirators and not Plaintiff, so the full nature and extent of the Conspiracy's anti-competitive effects are unknown to Plaintiff at this time.

## IX.    U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE CAPACITORS INDUSTRY

267.    Defendants' conspiracy to artificially raise, maintain, or stabilize prices for aluminum, tantalum, and film capacitors and to restrict the output of Affected Capacitors, was first

discovered in or around 2014 by law enforcement and regulatory authorities in the United States and throughout Asia.

268.    In April 2014, the DOJ Antitrust Division confirmed to industry sources that the government had opened an investigation into price fixing in the Affected Capacitors industry, led by the San Francisco office of the DOJ's Antitrust Division.

269.    The San Francisco office of the DOJ's Antitrust Division is leading the DOJ's ongoing investigation into the Affected Capacitors industry.

270.    Conspirator Panasonic became the first Conspirator to approach U.S. and Chinese authorities to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

271.    As a required part of applying for leniency through the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Panasonic admitted to price-fixing in the Affected Capacitors market. ACPERA provides criminal and civil leniency benefits for the first price fixing conspiracy participant who voluntarily comes forward and admits its anticompetitive conduct to the DOJ.

272.    In connection with its ACPERA application, Panasonic proffered facts and documents regarding the scope of its conspiratorial conduct. Plaintiff draws support for many of the allegations pled herein from that information.

273.    On September 2, 2015, the DOJ announced the first criminal charges in connection with the Conspiracy—against NEC TOKIN. The DOJ's September 2, 2015 Information against NEC TOKIN dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014," and charged that the Conspiracy sought "to suppress and eliminate competition by

fixing and rigging bids of certain electrolytic capacitors in the United States and elsewhere." The Information further alleged that NEC TOKIN "knowingly joined and participated in the charged conspiracy from at least as early as April 2002 until in or about December 2013." At a hearing held before the Honorable James Donato of the United States District Court for the Northern District of California on January 21, 2016, NEC TOKIN pleaded guilty "to the violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, that is charged in the Information."

274.    On April 7, 2016, the DOJ announced that Hitachi Chemical agreed to plead guilty to conspiring with competitors to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. Like the DOJ's information against NEC TOKIN, the DOJ's information against Hitachi also dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." The Information charged Hitachi Chemical with conspiring with its competitors between 2002 and 2010. On June 9, 2016 Hitachi Chemical pled guilty to conspiring with its competitors to fix the prices of electrolytic capacitors as charged in the Information.

275.    On August 22, 2016, the DOJ announced that Rubycon Corporation, had agreed to plead guilty for conspiring to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. The DOJ's Information against Rubycon Corporation charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere. The Information charged that Rubycon Corporation "knowingly joined and participated in the charged conspiracy from at least as early as August 2002 until in or about January 2014. In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." On October 12, 2016, Defendant Rubycon

Corporation pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

276.    On August 22, 2016, the DOJ also announced that ELNA Co., Ltd. had agreed to plead guilty for conspiring to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. The DOJ's Information against ELNA Co., Ltd. charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere. The Information charged that ELNA Co., Ltd. "knowingly joined and participated in the charged conspiracy from at least as early as August 2002 until in or about January 2014. In addition, the Information dated the Conspiracy from "at least as early as September 1997" until "in or about January 2014." On October 12, 2017, ELNA Co., Ltd. pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

277.    On August 22, 2016, the DOJ also announced that Holy Stone Holdings Co., Ltd. had agreed to plead guilty for conspiring to fix prices for electrolytic capacitors sold to customers in the United States and elsewhere. The DOJ's Information against Holy Stone Holdings Co., Ltd. charged the company with conspiring with its competitors to fix prices and rig bids for certain electrolytic capacitors in the United States and elsewhere. The Information charged that Holy Stone Holdings Co., Ltd. "knowingly joined and participated in the charged conspiracy from in or about April 2010 until in or about January 2014." In addition, the Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014." On October 12, 2017, Holy Stone Holdings Co., Ltd. pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

278.    On February 8, 2017, the DOJ announced that Matsuo Electric Co., Ltd. agreed to plead guilty to conspiring with competitors to fix prices and rig bids for electrolytic capacitors sold to customers in the United States and elsewhere. The DOJ's Information charged that Matsuo Electric Co., Ltd "knowingly joined and participated in the charged conspiracy from at least as early as November 2001 until in or about January 2014." The Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014." On October 12, 2017, Matsuo Electric Co., Ltd. pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

279.    On July 11, 2017, the DOJ announced that Nichicon Corporation agreed to plead guilty to conspiring with competitors to fix prices and rig bids for electrolytic capacitors sold to customers in the United States and elsewhere. The DOJ's Information charged that Nichicon Corporation "knowingly joined and participated in the charged conspiracy from at least as early as November 2001 until in or about December 2011." The Information dated the conspiracy from "at least as early as September 1997" until "in or about January 2014." On November 9, 2017, Nichicon Corporation pleaded guilty to conspiring to fix the prices of electrolytic capacitors as charged in the Information.

280.    On October 18, 2017, the DOJ announced that a federal grand jury had returned an indictment against Nippon Chemi-Con Corporation. The DOJ's Information charged that Nippon Chemi-Con Corporation had "[f]rom at least as early as September 1997 and continuing until in or about January 2004 ... knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices and rigging bids for electrolytic capacitors in the United States and elsewhere."

281.   In addition to the corporations themselves, the DOJ has also charged ten of Defendants' executives with conspiring to fix prices and rig bids for electrolytic capacitors.

282.   The DOJ has reportedly been coordinating its efforts to investigate the capacitors industry with the People's Republic of China's National Development and Reform Commission ("NDRC"), an agency entrusted with regulating price-related anticompetitive activity by the Chinese State Council.

283.   On or about July 2, 2014, the NDRC publicly confirmed its investigation into the capacitors industry through a report published in the China Price Supervision and Antitrust Journal and written by Xu Kunlin, Director-General of the NDRC's Price Supervision and Antimonopoly Bureau. In this report, Xu revealed that one Japanese capacitor company self-reported its cartel activity in March 2014, and that this company along with other Japanese capacitor manufacturers held regular conferences to exchange market information related to their products. Media and industry sources have quoted Xu as saying that the Japanese manufacturer seeking amnesty would receive complete leniency.

284.   On March 29, 2016, the Japan Fair Trade Commission ("JFTC") issued Cease and Desist Orders and Surcharge Payment Orders against a number of Conspirators, including Defendants Nippon Chemi-Con, and Matsuo, and co-conspirators Hitachi and Rubycon, for their participation in the Conspiracy. The orders were the product of an ongoing investigation that the JFTC began in or about June 2014 after Panasonic self-reported its involvement in the Conspiracy. According to media reports citing sources close to the JFTC's investigation, sales executives and other officials from the Conspirators discussed and agreed upon price increases for Affected Capacitors for at least several years during the Conspiracy Period.

285.    Since the beginning of 2014, investigations into the capacitors industry also have been opened by the South Korean Fair Trade Commission, the Taiwanese Fair Trade Commission, the European Commission's competition authority, and Brazil's Council for Economic Defense (CADE).

286.    On December 9, 2015, the South Korean Fair Trade Commission determined that a number of Conspirators, including Defendants Nippon Chemi-Con, ELNA, and Matsuo, and co-conspirators Nichicon and Rubycon, violated the Korean Fair Trade Act by exchanging sensitive business information and reaching agreements to restrain competition in Affected Capacitors.

287.    In November 2015, the European Union's antitrust regulator filed charges against ten Asian manufacturing companies that it suspects may have participated in a cartel to influence the sale of Affected Capacitors.

288.    In December 2015, Taiwan's Fair Trade Commission imposed a record fine of approximately $176.6 million on ten international capacitor suppliers for price collusion and joint monopolization; Taiwan's Fair Trade Commission Vice Chairman, Chiu Yung-ho, stated that the ruling was reached as a result of a joint investigation with the European Union, Singapore, and the United States.

289.    Sources suggest that certain of the Conspirators have been subject to raids orchestrated by authorities from around the world. To date, a few of the Conspirators have publicly commented about their being subject to these raids.

290.    During March 2014, the NDRC conducted several raids on Chinese operations of Japanese capacitors manufacturers. Following Chinese action, there have been reported raids in the European Union, Japan, and Korea.

291.     Conspirator Panasonic confirmed that it was raided by both the JFTC and South Korean authorities.

292.     Conspirator NEC TOKIN confirmed that it was contacted or raided by American, Chinese, and European authorities and has stated that it is cooperating with authorities.

293.     Defendant TOSHIN KOGYO confirmed that it was contacted by Japanese, Chinese, and Taiwanese authorities.

## X.     FRAUDULENT CONCEALMENT, EQUITABLE TOLLING, AND THE CONTINUING TORT DOCTRINE

294.     During the Conspiracy Period, Plaintiff had neither actual nor constructive knowledge of the pertinent facts upon which its claims are predicated, despite diligence in trying to discover such facts.

295.     Plaintiff could not have discovered through the exercise of reasonable diligence the existence of the Conspiracy alleged herein until in or about March 2014, when investigations by the DOJ and competition and law enforcement authorities in the People's Republic of China, Japan, Taiwan, South Korea and the European Union were first made public.

296.     Conspirators knew their activities were illegal and therefore agreed to keep the Conspiracy, their meetings regarding the Conspiracy, and all documents evidencing the Conspiracy highly confidential, even within their own companies.

297.     Conspirators did not take or distribute official minutes or reports concerning the secret cartel meetings discussed above because they recognized sensitive competitive information was exchanged amongst them during these meetings. Any disclosure of the matters, information, and data discussed in the many cartel meetings attended by Conspirators throughout the

Conspiracy Period could expose the Conspiracy, thereby frustrating its purpose and exposing Conspirators to criminal and civil liability throughout the globe, including in the United States.

298.    A 2006 email reflects Conspirators' efforts to keep their collusive actions secret: "[E]xchanging information is useful. . . . However, it may become a double-edged sword at times. To the extent possible, try to exchange verbally so that no evidence is left behind. Especially pricing figures and important presentation materials."

299.    The secret cartel meetings are evidenced by emails, summaries, and notes drafted by the employees of Conspirators who attended the meetings. These documents, which evince Conspirators' collusive discussions and unlawful agreements, were circulated only among a limited number of employees who were responsible at their respective companies for implementing the cartel's anticompetitive agreements. These emails, summaries, and notes regularly included instructions from their authors to guard the documents with the utmost caution due to the sensitive competitive information contained therein.

300.    For example, October 2008 MK meeting notes included the following warning: "Since [t]he gathering should not be disclosed to the public, please be careful when handling the contents of the present report."

301.    An October 15, 2005 email regarding a customer's frustrations with undersupply and excess lead times warned that "information leakage regarding this matter would cause grave problems that would lead directly to a suspension of transaction. We urgently request you to take the utmost care in this matter."

302.     Similar conspiratorial correspondences read, "[p]lease do not distribute this email unless it is absolutely necessary[,]" "[p]lease take the utmost care in handling this report[,]" and, "[o]nce you read this email, please delete it."

303.     Conspirators also guarded the identities of Conspirators and their relevant employees by using code to refer to such participants in written communications, e.g., "Company E," "Company H," "Company M," "Company N," "Company NC," "Company R."

304.     Conspirators further concealed the Conspiracy from Affected Capacitors consumers by providing pre-textual justifications for the pricing changes and the reductions in output and increased production lead times that occurred during the Conspiracy Period, citing materials shortages, labor shortages, and weather events.

305.     For example, in 2010, Conspirators including Nichicon and Nippon Chemi-Con each made a number of public statements to industry and technology media in which they attributed supply limitations and price quote adjustments to shortages of aluminum foil and increasing costs for other raw materials required for manufacturing.

306.     With respect to tantalum capacitors, Conspirators cited a worldwide shortage of tantalum. In 2010 and 2011, Conspirator Panasonic made a number of public statements to industry and technology media attributing supply limitations and pricing adjustments for its tantalum electrolytic capacitors to raw materials supply issues.

307.     Conspirators also made numerous misleading excuses to justify their price increases, including alleged labor shortages and shipping delays due to weather events in Asia.

308.    More specifically, from 2011 to 2013, Conspirators, including Defendants Nippon Chemi-Con, and ELNA, and co-conspirators Hitachi and Rubycon, attributed their production delays to the lasting effects of the 2011 Tohoku earthquake and tsunami in eastern Japan.

309.    Conspirators' pre-textual, materially false, and misleading statements were designed to conceal their conspiracy and convince Plaintiff and other customers that the artificially high Affected Capacitors pricing and increased production lead times were the natural result of ordinary market forces, rather than the product of any conspiracy.

310.    As a result of the fraudulent concealment of the Conspiracy by Defendants and their co-conspirators, the running of any applicable statute of limitations has been tolled with respect to any claims that Plaintiff has as a result of the anticompetitive and unlawful conduct alleged herein.

311.    Also as a result of Defendants' fraudulent concealment of the Conspiracy, Defendants are equitably estopped from asserting statutes of limitations defenses.

312.    Further, the multi-year Conspiracy constitutes a continuing tort, and therefore, the statute of limitations cannot accrue until the last act of Conspirators' unlawful conduct. The Conspiracy continued until at least 2014, although documents in the possession of Defendants and their co-conspirators may reveal that it lasted even longer.

313.    Additionally, on July 18, 2014, a class-action complaint asserting materially similar claims against Defendants Nippon Chemi-Con, ELNA, Matsuo, and TOSHIN KOGYO was filed in the U.S. District Court for the Northern District of California, Case Number 14-cv-03264-JD. The class representatives filed materially similar claims against Defendants Nissei, Nitsuko, Okaya, Shinyei, Soshin, and Taitsu by December 4, 2014, and a second amended class-action complaint adding Shizuki was filed and served on July 22, 2015. At all times, Plaintiff Arrow was

defined as a member of the putative class. Accordingly, any limitations period on Arrow's claims against these Defendants has been tolled since the filing of the class-action complaints against them.

## XI.   PLAINTIFF'S INJURIES

314.    Plaintiff suffered direct, substantial, and reasonably foreseeable injuries as a purchaser of Affected Capacitors as a result of the Conspiracy.

315.    Plaintiff purchased Affected Capacitors directly from certain of the Conspirators at prices that were artificially inflated as a result of the Conspiracy.

316.    Throughout the Conspiracy Period, Conspirators controlled the market for Affected Capacitors and intentionally used their market power and collusive agreements to increase market prices. As a result, during the Conspiracy Period, Plaintiff was forced to purchase Affected Capacitors at artificially inflated prices.

317.    Accordingly, Plaintiff suffered antitrust injury in connection with its purchases of Affected Capacitors during the Conspiracy Period, in an amount equal to the total of the overcharges it paid, to be determined at trial.

## XII.   CLAIM FOR RELIEF

### Restraint of Trade in Violation of the Sherman Act § 1,
### 15 U.S.C. § 1 (Alleged Against All Defendants)

318.    Plaintiff hereby incorporates and re-alleges each and every allegation set forth in the preceding paragraphs of this Complaint.

319.    Beginning no later than 1997 and continuing through at least January 2014 (the exact dates being unknown to Plaintiff and exclusively within the knowledge of Conspirators),

Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of aluminum, tantalum, and film capacitors sold directly to U.S. purchasers.

320.    In particular, Defendants and their co-conspirators have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of aluminum, tantalum, and film capacitors sold to United States purchasers during the Conspiracy Period.

321.    As a result of Defendants' unlawful conduct, prices for Affected Capacitors were raised, fixed, maintained, and stabilized in the United States.

322.    The agreement, combination, or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Conspirators.

323.    For purposes of formulating and effectuating their agreement, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(a)     Participating in meetings and conversations to discuss pricing and supply of Affected Capacitors;

(b)     Allocating customers and market shares between themselves through bid-rigging;

(c)     Communicating (both orally and verbally) to fix target prices, floor prices, and price ranges for Affected Capacitors;

(d)      Agreeing to manipulate prices and supply of Affected Capacitors sold in the United States in a manner that deprived direct purchasers of free and open competition;

(e)      Issuing price announcements and price quotations in accordance with the agreements reached;

(f)      Selling Affected Capacitors to customers in the U.S. at noncompetitive prices;

(g)      Exchanging competitively sensitive information, including customer information and sales data, in order to facilitate their conspiracy;

(h)      Setting artificial and unjustified production lead times to limit the available supply of Affected Capacitors available for sale to U.S. purchasers during the Conspiracy period;

(j)      Otherwise agreeing to maintain or lower production capacity; and

(i)      Providing false statements to the public to explain increased prices and undersupply for Affected Capacitors.

343.    As a result of the unlawful conduct and acts undertaken in furtherance of the Conspiracy by Defendants and their co-conspirators, Plaintiff's business and property were injured, in that Plaintiff paid more for Affected Capacitors than it would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

## XIII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment in Plaintiff's favor and against Defendants adjudging and decreeing that:

A.      Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and that Plaintiff's business and property were injured as a result of Defendants' violations;

B.      Plaintiff shall recover damages sustained by it as provided by the federal antitrust laws, and a joint and several judgment in favor of Plaintiff shall be entered against the Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.      Plaintiff shall be awarded pre-judgment and post-judgment interest on the damages it suffered, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

D.      Plaintiff shall recover its costs and fees incurred in this suit, including reasonable attorneys' fees as provided by applicable law; and

E.      Plaintiff shall receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this complaint so triable.


Dated: April 16, 2018


*/s/ Philip J. Iovieno*
Philip J. Iovieno
Anne M. Nardacci
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Telephone:    (518) 434-0600
Facsimile:    (518) 434-0665
Email:  piovieno@bsfllp.com
            anardacci@bsfllp.com

William A. Isaacson
Kyle Smith
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Telephone:      (202) 237-2727
Facsimile:      (202) 237-6131
Email:  wisaacson@bsfllp.com
        ksmith@bsfllp.com

Stuart H. Singer
Meredith Schultz
Pascual Oliu
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
Telephone:      (954) 356-0011
Facsimile:      (954) 356-0022
Email:  ssinger@bsfllp.com
        mschultz@bsfllp.com
        poliu@bsfllp.com

*Attorneys for Plaintiff*